**In re Robert and Gloria SAUER, Debtors.**

**In re Willard and Joyce Sauer, Debtors.**

**Bankruptcy Nos. 97–31715, 97–31717.**

United States Bankruptcy Court,
D. North Dakota.

May 27, 1998.

Suzanne M. Schweigert, Smith, Bakke, Hovland & Oppegard, Bismarck, ND, for Gloria and Robert Sauer.

Wayne Drewes, Fargo, ND, trustee.

## MEMORANDUM & ORDER

WILLIAM A. HILL, Bankruptcy Judge.

Debtors Robert and Gloria Sauer, and Willard and Joyce Sauer, farming in partnership under the name "Sauer Brothers," each filed respective voluntary petitions for relief under Chapter 12 of the United States Bankruptcy Code ("Code") on November 12, 1997. In companion plans, they proposed claim treatment and reorganization which they believed capable of achieving confirmation. The United States of America, acting through Farm Service Agency ("FSA"), and Dakota Community Bank ("Community Bank") filed objections to the plans. Now before the Court for confirmation are the debtors' respective first modified plans ("modified plans"), filed on April 20, 1998, to which FSA and Community Bank continue in their objections.

FSA and Community Bank principally object to the modified plans on grounds of feasibility. Relatedly, FSA additionally objects to the debtors' proposed use of their anticipated Production Flexibility Contract ("PFC") and Conservation Reserve Program ("CRP") payments to fund their FSA plan disbursements, contending that the payments are subject to a right of setoff pursuant to Code § 553. In turn, Community Bank further objects to the debtors' treatment of its secured claim under their modified plans on the following bases: its secured claim is understated; the interest provision on the claim is insufficient; and the repayment term on the claim is excessive in light of the nature, age, and condition of its collateral. Lastly, Community Bank objects to the debtors' modified plans on the ground that they fail to contingently provide for the possibility that it might prevail in its adversary action against the debtors, which is currently pending before the Court. A hearing in this matter was held on April 20, 1998.

### I. Facts

The Court begins by noting that aside from unsecured indebtedness, the debtors' plans are, in the main, identical, with only slight variations in secured indebtedness and projected living expenses. As the debtors farm in partnership, and have executed loan documents and security instruments in that form, all references hereinafter to "the debtors," unless otherwise indicated, shall relate to the cases of both Robert and Gloria, and Willard and Joyce. For purposes of simplification, references to "each of the debtors" shall relate to each of the debtor couples, separately.

#### 1.

Debtors Willard and Robert Sauer are brothers. They, along with their respective wives Joyce and Gloria, reside in Carson, North Dakota. Their farming operation, conducted in partnership under the name "Sauer Brothers," consists of small grain farming, cattle ranching, and dairy production conducted on approximately 2400[1] acres

---

1. The debtors describe their farm real property as comprising 2080 acres. However, by their legal description of the real property in question, it would appear that the debtors' interest therein more closely approximates 2400 acres. In American land law, a "section of land" represents "[a] division or parcel of land, on the government survey, comprising one square mile or 640 acres." *Black's Law Dictionary* 1521 (4th ed. rev.1975); *see* William D. Johnstone, *For Good*

*Measure: A Complete Compendium of International Weights and Measures* 65 (Holt, Rinehart and Winston eds., 1975). The debtors' describe their property in their schedules as follows:

All Section 19; W1/2NE1/4 Section 20; S1/2 Section 21; N1/2 and N1/2SW1/4 and SW1/4 Section 28. Grant County, North Dakota. Township 131 North, Range 87 West:

of farm- and ranchland in Grant County, North Dakota. The debtors currently own 54 beef cows, 34 beef calves, 56 dairy cows, and 18 dairy calves.[2] They also own a 60% interest in 40 share cows. Additionally, Willard and Joyce own as their personal property farming equipment and implements used in the debtors' combined farming operation.

The debtors have recently experienced financial difficulties over the span of at least several years. During this time they realized only minimal gains from their farming endeavors, as chronicled in their federal income tax returns for the years 1994 through 1996. The Court has compiled this data into the following tables:

### Actual Gross Farm Income

| | 1994 | 1995 | 1996 |
| ------------------- | ----------- | ----------- | ------------ |
| Willard and Joyce: | 50,914.86 | 51,748.47 | 63,861.07 |
| Robert and Gloria: | 48,169.52 | 46,952.34 | 57,562.47 |
| TOTAL | $99,084.38 | $98,700.81 | $121,423.54 |

### Actual Farm Expenses

| | 1994 | 1995 | 1996 |
| ------------------- | ----------- | ----------- | ------------ |
| Willard and Joyce: | 45,408.96 | 42,656.34 | 55,807.46 |
| Robert and Gloria: | 45,246.04 | 45,760.50 | 55,288.88 |
| TOTAL | $90,655.00 | $88,416.84 | $111,096.34 |

### Actual Net Farm Income

| | 1994 | 1995 | 1996 |
| ------------------- | ----------- | ----------- | ------------ |
| Willard and Joyce: | 5,505.84 | 9,092.13 | 8,053.61 |
| Robert and Gloria: | 2,923.48 | 1,191.84 | 2,273.59 |
| TOTAL | $8429.32 | $10,283.97 | $10,327.20 |

As a result of their difficulties, the debtors filed for protection under Chapter 12 of the Code on November 12, 1997.

**2.**

Since July 31, 1989, the debtors have been participants in the Conservation Reserve Program, and in 1996 entered into five Production Flexibility Contracts with Commodity Credit Corporation.[3] On December 15,

---

N1/2 and SW1/4 Section 20; N1/2 and N1/2SW1/4 and SW1/4SW1/4 Section 28. Grant County North Dakota.
In ordinary parlance, this description consists of a whole section, four one-half sections, a one-quarter section, three one-eighth sections, and two one-sixteenth sections; or 640 acres, 1280 acres, 160 acres, 240 acres, and 80 acres, respectively, totaling 2400 acres.

**2.** In their schedules, each of the debtors has listed full ownership of 27 beef cows, 17 beef calves, 28 dairy cows, and 9 dairy calves. The debtors, then, assert ownership in a total of 54 beef cows and 34 beef calves, and 56 dairy cows and 18 dairy calves. However, during his testimony at the April 20 hearing, Robert testified that his livestock consisted of 27 beef cows, 42 beef calves, 27 dairy cows, 10 dairy calves, and 6 yearlings. He testified that these figures constituted one-half of the debtors' total livestock. Thus, Robert's tally differs from the figures contained within the debtors' schedules. Yet, the debtors have not amended their schedules to reflect this difference. Further, there is no evi-

dence to conclusively refute the debtors' schedule statements. As each of the debtors' schedule statements were sworn under the penalty of perjury, the Court must conclude that their schedule statements are correct concerning their total number of beef and dairy livestock.

**3.** As background, the Court notes that the Commodity Credit Corporation ("CCC") is "a body corporate . . . [and] an agency and instrumentality of the United States within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture," which was created in 1948 for the purpose of "stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance and balanced and adequate supplies of agricultural commodities . . . and of facilitating the orderly distribution of agricultural commodities[.]" 15 U.S.C.A. § 714 (West 1998). The Agriculture Stabilization and Conservation Service ("ASCS") acts on behalf of CCC to administer government farm programs thereunder. ASCS administers both the Conservation Reserve Program

1997, they filed respective motions to assume their executory contracts under the CRP and PFC, which the Court granted on January 6, 1998. There are two years remaining on the debtors' contracts under the CRP and five years remaining on those under the PFC. Over the life of the contracts, the debtors anticipate receiving a minimum of $30,910.30. Over the life of the plan, they anticipate receiving $22,590.60 therefrom.

On December 19, 1997, the debtors filed a motion for authority to use cash collateral in their possession, which constituted proceeds from their sale of livestock in which they had previously granted FSA and Community Bank security interests. By their motion, the debtors sought the Court's permission to consume $8483.79 in cash proceeds for operating expenses essential to seeding, and securing the increments necessary to raising, their 1998 crop. As adequate protection, they proposed a replacement lien in the 1998 crop, together with a pledge of crop insurance. Community Bank objected to the motion on December 31, 1997. FSA filed a response to the motion on January 2, 1998, conditioning its acceptance upon the receipt of a replacement lien and adequate protection in an amount equivalent to the funds released. The debtors entered into a stipulation for release of the cash collateral with FSA on February 9, 1998, agreeing to provide it with an assignment of a cash rent payment under the AMTA program in the amount of $3,500.00, and further agreeing to

incorporate the terms of the stipulation into their Chapter 12 plan. The Court approved the stipulation on February 11, 1998.

A hearing was held on the debtors' motion on March 23, 1998. At that time, the debtors made their first disclosure that the proceeds which they held from the sale of the collateral of Community Bank and FSA had increased to $11,688.54, and they then sought the release of the same. By its order of April 3, 1998, incorporating the terms of the March 23 hearing, the Court granted the debtors' motion as to the release of half as much cash collateral as had been requested, or $5,844.27. As adequate protection for the debtors' use of the funds, Community Bank was granted a replacement lien in the 1998 crop, as well as an assignment of any and all insurance covering its loss, limited to the extent of the proceeds released to the debtors.

Relatedly, Community Bank commenced an adversary proceeding against the debtors, *Dakota Community Bank, f/k/a First State Bank v. Robert A. Sauer et al.*, Adversary Number 98–7006, which is currently pending before this Court. By this action, Community Bank contends that it has been injured by the debtors' conversion to their own use of property, or its proceeds, in which Community Bank holds a lien, including proceeds from the sale of cattle, and possibly grain and livestock as well. FSA holds an inferior lien in this property. Community Bank seeks to

("CRP"), which arises pursuant to 16 U.S.C.A. §§ 3831–3843 (West 1998), and Agriculture Marketing Transition Act ("AMTA"), which arises under 7 U.S.C.A. § 7201–7339 (West 1998).

Under the CRP, the Secretary of Agriculture is charged with formulating and carrying out "the enrollment of lands in a conservation reserve program through the use of contracts to assist owners and operators of [eligible] lands ... to conserve and improve the soil and water resources of such lands." 16 U.S.C.A. § 3831(a) (West 1998). By entering the CRP program, eligible producers agree to convert eligible land to a conserving use for the duration of their contracts in return for annual rental payments and cost-share assistance from CCC. 7 C.F.R. § 1410.101 (1997). Currently, contracts under the program endure for "not less than 10, nor more than 15, years." 16 U.S.C.A. § 3831(e)(1) (West 1998).

The AMTA program allows for the use of Production Flexibility Contracts ("PFC") with eligible owners or producers on farms containing eligible cropland. Under the terms of the PFC, the owner or producer receives annual contract payments from the CCC in exchange for his compliance with, inter alia, pertinent conservation requirements, wetland protection requirements, planting flexibility requirements, and land use restrictions. 7 U.S.C.A. §§ 7201, 7211 (West 1998).

Generally, CRP rental payments are made in cash or in-kind payments. 16 U.S.C.A. § 3834(d) (West 1998). Otherwise, payments made under the CCC may be made in cash, in-kind, in commodity certificates, or any combination thereof. 7 C.F.R. pt. 704.17 (1997).

have the debtors' indebtedness to it of $85,064.48 declared nondischargeable. A trial has been scheduled in this matter for June 23, 1998.

### 3.

In their schedules, the debtors list a number of priority and secured debts. In this respect, Grant County Treasurer ("Grant County") maintains a priority claim of $21,043.05 against the debtors for delinquent real estate taxes dating from 1993 through 1997. The Bank of North Dakota holds a claim in the amount of $90,023.74, secured by a first mortgage on portions of the debtors' farm real property and a second lien in various of their chattels. Clara Sauer holds a claim of $192,820.08, secured by a first mortgage on portions of their property. Community Bank possesses a claim of $85,064.48, secured by a first priority lien on the debtors' livestock, crops, inventory, machinery, and accounts. Lastly, FSA maintains a claim in the amount of $168,503.45, secured by a second mortgage in the debtors' farm real property, as well a second priority lien on their livestock, crops, inventory, and machinery.

The debtors propose to treat these priority and secured claims under their modified plans. They provide for the $21,043.05 priority claim of Grant County by proposing three annual payments of $7,014.35 due on February 15 of each year, with the first payment due in 1999. They propose to treat the $90,023.74 secured claim of the Bank of North Dakota by making payment on (1) the $8,820.09 in arrearage included therein over a three-year period, without interest, in $2,940.03 installments due on April 1 of each year, with the first payment due in 1999; and (2) the remaining $81,203.65 over a period of twenty-one years with interest at the rate of 9.25%, payments being due April 1 of each year, with the first payment due in 1999. They propose to treat the $192,820.08 secured claim of Clara Sauer by making payments over thirty years, with the first payment due on December 15, 1998 in the amount of $4,017.09, and payments of $6,427.34 due on December 15 of each year thereafter.

The debtors treat only $65,000.00 of the $85,064.48 claim of Community Bank as secured, and propose to make payments on that amount over seven years with interest at the rate of 10% with payments due January 1 of each year, beginning in 1999 in the amount of $8,900.91, and thereafter in the amount of $13,351.36 annually. Similarly, the debtors propose to treat only $94,080.10 of the $168,503.45 claim of FSA as secured, providing for payment over thirty years, with interest of 6.5%, due on January 1 of each year with the first payment in the amount of $4,802.94 due in 1999, and payments of $7,204.41 due each year thereafter. The debtors propose to reduce their annual payment to FSA by monthly milk assignment payments of $140.00 pursuant to a prepetition agreement, leaving annual payments after 1999 in the amount of $5,524.41. The debtors additionally provide that FSA shall receive up to $5,524.41 of their farm program payments, which will be applied to their annual plan payment to FSA, with any remaining government payments over and above that amount to be turned over to the debtors for their use.

Parenthetically, Norwest Bank holds a claim in the amount of $804.45 against Willard and Joyce, secured by their 1989 Dodge Caravan. Willard and Joyce propose "to reaffirm this debt pursuant to the terms of their current contract[, making] payments ... in the amount of $209.45 each month until the debt is paid in full."

### 4.

Attachments to the debtors' modified plans and post-confirmation-hearing briefs include projections of their farming and total incomes, farm-related expenses, and plan disbursements and living expenses for the years 1998 through 2000. First, the debtors project total farming income of $123,269.87 in 1998, $126,600.60 in 1999, and $126,600.60 in 2000, to be divided equally among them, along with each of the debtors' total income figures, as detailed below:

### Anticipated Farming Income

| | 1998 | 1999 | 2000 |
|---|---|---|---|
| Crop Sales | 17,297.73* | 23,142.00 | 23,142.00 |
| 140 acres sunflowers: $17,640.00 | | | |
| 78.6 acres wheat: $5,502.00 | | | |
| Livestock | 23,159.00 | 23,159.00 | 23,159.00 |
| Raw Products | 50,673.60** | 50,673.60** | 50,673.60** |
| Gov't Payments | 8,366.00 | 8,366.00 | 6,964.00 |
| CRP Payment or Crop Sales: | 0.00 | 0.00 | 1,402.00 |
| Cash and Pasture Rent: | 16,460.00 | 16,460.00 | 16,460.00 |
| Pasture Rent Cow/Calf Pairs: | 4,800.00 | 4,800.00 | 4,800.00 |
| 1997 Livestock Proceeds | 2,513.54*** | 0.00 | 0.00 |
| TOTAL FARM INCOME: | $123,269.87 | $126,600.60 | $126,600.60 |
| Each Brother's Respective Share: | 61,634.94 | 63,300.30 | 63,300.30 |
| 1998 Carryover | 0.00 | 14,317.89 | 0.00 |
| 1999 Carryover | 0.00 | 0.00 | 12,419.66 |
| Each Brother's TOTAL INCOME: | $61,634.94 | $77,618.19 | $75,715.96 |

*Less crop lien.

**FSA has $140 per month assignment on milk, totaling $1,680.00 annually. Therefore, the debtors' actual annual income from the sale of raw products is $48,993.60.

***Less $9,175.00 used for cash rent.

Next, the debtors project total farming expenses of $49,135.00 in 1998, $50,735.00 in 1999, and $50,335.00 in 2000, to be divided equally among them, and detailed as follows:

### Anticipated Farming Expenses

| | 1998 | 1999 | 2000 |
|---|---|---|---|
| Feed | 2,000.00 | 2,000.00 | 2,000.00 |
| Fertilizer | 2,500.00 | 2,500.00 | 2,500.00 |
| Seed | 1,500.00 | 1,500.00 | 1,500.00 |
| Repairs | 2,500.00 | 2,500.00 | 2,500.00 |
| Attorney Fees | 3,000.00 | 2,000.00 | 2,000.00 |
| Trustee Fees | 1,800.00 | 900.00 | 500.00 |
| Fuel | 4,500.00 | 4,500.00 | 4,500.00 |
| Chemicals | 1,800.00 | 1,800.00 | 1,800.00 |
| Insurance | 1,380.00 | 1,380.00 | 1,380.00 |
| Utilities | 3,200.00 | 3,200.00 | 3,200.00 |
| Auto Expense | 1,500.00 | 1,500.00 | 1,500.00 |
| Machine Hire | 1,200.00 | 1,200.00 | 1,200.00 |
| Labor Hire | 380.00 | 380.00 | 380.00 |
| Supplies | 1,450.00 | 1,450.00 | 1,450.00 |
| Cash Rent | 16,850.00 | 16,850.00 | 16,850.00 |
| Cattle Expenses | 1,500.00 | 1,500.00 | 1,500.00 |
| Trucking | 1,475.00 | 1,475.00 | 1,475.00 |
| ADA | 450.00 | 450.00 | 450.00 |
| Income Tax | 150.00 | 150.00 | 150.00 |
| 1998 R.E. Taxes | 0.00 | 3,500.00 | 0.00 |
| 1999 R.E. Taxes | 0.00 | 0.00 | 3,500.00 |
| TOTAL: | $49,135.00 | $50,735.00 | $50,335.00 |
| Each Brother's Respective Share: | $24,567.50 | $25,367.50 | $25,167.50 |

Lastly, the debtors project plan distributions and living expenses. Because their respective figures vary slightly, they will be listed separately. Robert and Gloria project the following annual distributions and living expenses under their modified plan:

Anticipated Plan Disbursements

| | 1998 | 1999 | 2000 |
|---|---|---|---|
| Plan Distributions: | | | |
| Grant County | 0.00 | 3,507.18 | 3,507.18 |
| Bank of North Dakota | 0.00 | 5,920.00* | 5,919.91* |
| Clara Sauer | 2,008.55 | 3,213.67 | 3,213.67 |
| FSA | 1,741.00 | 2,401.47 | 3,602.21 |
| Community Bank | 0.00 | 5,788.80 | 8,683.21 |
| Plan Payments: | $3,749.55 | $20,831.01 | $24,926.18 |
| Living Expenses: | 19,000.00 | 19,000.00 | 19,000.00 |
| TOTAL: | $22,749.55 | $39,831.01 | $43,926.18 |

* The debtors' payments to Bank of North Dakota in 1999 and 2000 are comprised of payments in each year of $4,449.89 on its real estate claim and $1,470.02 in arrearage and interest.

Willard and Joyce make the following annual distributions and living expenses under their modified plan:

Anticipated Plan Disbursements

| | 1998 | 1999 | 2000 |
|---|---|---|---|
| Plan Distributions: | | | |
| Grant County | 0.00 | 3,507.18 | 3,507.18 |
| Bank of North Dakota | 0.00 | 5,920.00* | 5,919.91* |
| Clara Sauer | 2,008.55 | 3,213.67 | 3,213.67 |
| FSA | 1,741.00 | 2,401.47 | 3,602.21 |
| Community Bank | 0.00 | 5,788.80 | 8,683.21 |
| Norwest Bank | 804.45 | 0.00 | 0.00 |
| Plan Payments: | $4,554.00 | $20,831.01 | $24,926.18 |
| Living Expenses: | 20,000.00 | 20,000.00 | 20,000.00 |
| TOTAL: | $24,554.00 | $40,831.01 | $44,926.18 |

* The debtors' payments to Bank of North Dakota in 1999 and 2000 are comprised of payments in each year of $4,449.89 on its real estate claim and $1,470.01 in arrearage and interest.

The debtors have also included among their attachments a liquidation analysis demonstrating that there would be no remaining value from which to pay unsecured creditors were the debtors to convert their cases to Chapter 7 of the Code.

5.

Both Community Bank and FSA make their principal objections to the debtors' modified plans on the basis of feasibility, arguing numerous grounds thereunder.

First, Community Bank and FSA object to the debtors' income and expense projections as being unrealistic and not based upon their historic yield and income data, as demonstrated in their 1994 through 1996 federal income tax returns. In this respect, Community Bank contends that the debtors' modified plans would not cash flow were they based upon the historic data.

Second, they object that the debtors' first annual installment payment to FSA, as detailed in their cash flow projections, is only a

partial payment totaling $3,482.00, or $1,741.00 each, whereas their modified plans state the payment shall aggregate $4,802.94, or $2,401.47 apiece. FSA contends that the debtors will have enjoyed a full production year from the filing of their petition until the time the first FSA installment payment falls due, and that they should therefore be required to make a full annual installment payment aggregating $4,802.94, on or before January 1, 1999.

Third, they object that the debtors' cash flow projections only provide that Clara Sauer and FSA are to receive any payment from the debtors' 1998 projected net farm income of $17,067.44. In contrast, Community Bank and FSA note that the modified plans provide that Community Bank is to receive its first annual aggregate payment of $4,449.89 from the debtors by January 1, 1999; Grant County is to receive its first payment of $3,507.18 by April 1, 1999; and the Bank of North Dakota is to receive its first payments of $1,470.02 and $4,449.89 by April 1, 1999. They contend that these payments can only be met from the debtors' 1998 net farm income, as they fall due before the debtors will realize any of their 1999 farm income.

Fourth, they argue that the debtors' projected 1998 net farm income is insufficient to meet all of their payment obligations to these combined creditors. They assert that after making payments to Clara Sauer and FSA, as provided under the modified plans, each of the debtors will be left with only $12,657.65 to service $13,877.55 in payments to Community Bank, Grant County, and the Bank of North Dakota. Moreover, Community Bank notes that the modified plans would only be feasible in the years 1999 and 2000 if carryover funds exist from 1998, which it contends will be lacking.

Community Bank separately objects that the modified plans improperly treat its secured claim. To begin, Community Bank argues that the debtors' collateral in which it holds a security interest, that being their machinery, equipment, and cattle, has a value in excess of $65,000.00, and that the debtors' modified plans understate its secured claim of $85,064.48 by valuing the collateral at $65,000.00. Next, Community Bank contends that plan provisions providing a repayment term of ten years for its claim are inappropriate, considering the nature, age, and condition of its collateral, and instead argues that its claim should be paid over five years. Furthermore, Community Bank asserts that the interest rate of 8.5% to be paid on its claim under the modified plans is insufficient, and instead posits that it should receive interest at the rate of 12%. Moreover, Community Bank argues, in relation to plan feasibility, that increased payments by the debtors under these terms will increase their negative cash flow situation.

Additionally, Community Bank objects to the debtors' modified plans for failing to provide for the possibility that Community Bank might prevail in its adversary proceeding against them. Community Bank contends that the debtors' plans must contemplate, and contain contingency provisions for, the treatment of Community Bank's claim should it prevail in that action.

FSA also separately objects to the debtors' modified plans. Initially, it argues that the debtors' testimony that they will earn income from share cattle is in all respects unsubstantiated. Next, it contends that the debtors have failed to explain the $5,800.00 difference between their 1998, and 1999 and 2000, crop incomes in their cash flow projection. Additionally, FSA objects that the debtors' cash flow projections fail to provide interest on their plan payments to Grant County in 1999 and 2000, whereas their modified plans, in paragraphs 5(a), allow for the delinquent real estate taxes to be paid over the life of the plan with interest to accrue as required by North Dakota state law. Finally, it objects that the debtors have failed to provide for repayment to Community Bank of the $5,844.27 in cash collateral released to them by the April 3, 1998 order of the Court, and have further failed to provide for repayment to FSA of $3,482.00, as required by the terms of their February 9, 1998 stipulation for release of cash collateral. FSA contends that the debtors are to make this repayment through an assignment of rental income which they will derive from a portion of their real property.

FSA also objects to the debtors' plan provisions to use annual payments derived under their executory CRP and PFC contracts to fund their annual plan distributions on its real estate secured claim. It also objects to the debtors' plan provisions claiming for their own use any surplus remaining from these contracts. Instead, FSA claims a right of setoff against the debtors' executory contracts under the CRP and PFC, or in the alternative, a separate secured claim in that amount based upon its right of setoff.

Relatedly, FSA argues that should the Court allow it to offset the debtors' CRP and PFC proceeds, its secured real estate claim should not be reduced accordingly. FSA cites the following bases in support of its position: the debtors' appraisal of their real property makes no adjustment in value for the fact that 89.6 acres of their farm real property is enrolled in the CRP; the debtors' CRP contract expires in two years and only a slight amount remains to be realized from the contract; and a potential buyer of the real property will be able to assume these contracts, which might elicit a higher price for the land.

Before reaching the issue of the feasibility of the debtors' plans, in the context of confirmation, the Court will discuss another argument raised in opposition thereof. The Court begins by first addressing FSA's claim to a right of setoff, as this issue will potentially determine the debtors' ability to reorganize.

## II. Discussion of Law

### 1. Setoff

"The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 289, 133 L.Ed.2d 258 (1995) (quoting *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913)); *see also Gratiot v. United States*, 40 U.S. (15 Pet.) 336, 370, 10 L.Ed. 759 (1841) (Setoff is the "common right, which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in

extinguishment of the debts due to him."). Although the Bankruptcy Code does not create a federal right of setoff, Section 553(a) preserves, with certain exceptions, any right of setoff which otherwise exists. *Strumpf*, 516 U.S. at 18, 116 S.Ct. at 289; *accord United States v. Gerth*, 991 F.2d 1428, 1430 (8th Cir.1993).

Section 553(a) provides in relevant part that:

Except as otherwise provided in this section ..., this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtors is disallowed;

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case; or

(B) (i) after 90 days before the date of the filing of the petition; and

(ii) while the debtor was insolvent; or

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition;

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.

11 U.S.C. § 553(a). In order to establish a right of setoff under this section, the creditor must establish the following three elements:

1. A debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case.

2. The creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case.

3. The debt and the claim are mutual obligations.

*Gerth,* 991 F.2d at 1431; *see Kalenze v. Federal Crop Ins. Corp. (In re Kalenze),* 175 B.R. 35, 37 (Bankr.D.N.D.1994). Otherwise put, "it is necessary only that the debt and the claim both arose prepetition and are mutual." 991 F.2d at 1431.

■ It is undisputed that all three of the statutory elements necessary to setoff are satisfied in the instant matter. FSA asserts, and the debtors' concede, that the debtors' indebtedness to FSA of $168,503.45 arose prepetition; that the debtors are entitled to receive a minimum of $30,910.30 from CCC over the life of their CRP and PFC contracts, and that their claim thereunder arose prepetition [4]; and that debt and claim are mutual obligations. Thus, it would appear that FSA is entitled to a right of setoff of the debtors' forthcoming CRP and PFC payments.

Nevertheless, some case law on this subject would instruct otherwise. While most courts which have exercised discretion to limit or deny setoff have done so in response to the presence of illegal or fraudulent conduct, or a breach of fiduciary duty, *see, e.g., Blanton v. Prudential–Bache Sec., Inc. (In re Blanton),* 105 B.R. 321, 337–38 (Bankr. E.D.Va.1989) (and cases cited therein); others, too, hold the same where setoff would hinder or destroy a debtor's ability to reorganize, *see, e.g., In re Allen,* 135 B.R. 856, 870 (Bankr.N.D.Iowa) (and cases cited therein).

■ However, this Court must depart from the those latter decisions, on the basis that the statutory language under which the right of setoff is preserved, unhampered,

does not admit to such an exception. This judicially-created shelter which has arisen exclusively for reorganizing debtors is not found within Section 553. Indeed, the only exceptions to the rule that a creditor's right to setoff shall be unaffected by bankruptcy appear within the section itself. And of the enumerated exceptions therein, no provision has been made immunizing reorganizing debtors from any otherwise valid rights of setoff asserted against them. Rather, Congress has clearly and expressly provided in Section 553 that the Bankruptcy Code *"does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case...."* 11 U.S.C. § 553(a). Thus, the right to setoff under the statute exists equally in cases of liquidation as it does in those of reorganization. *See Turner v. Small Bus. Admin. (In re Turner),* 84 F.3d 1294, 1299 (10th Cir. 1996) ("Section 553, which clearly preserves existing setoff rights in the context of bankruptcy, applies to both liquidations as well as reorganizations.... This statutory provision simply is inconsistent with the notion that the Bankruptcy Code prohibits an administrative offset in a reorganization case."). Accordingly, there is no justification for dissimilar application of the statute between the two.

■ Moreover, it is not without significance that the statute preserves in eligible creditors a *right of setoff.* The term "right"

---

4. The debtors do not deny that their CRP and PFC claims arose prepetition. Rather, they note that their receipt of funds under the prepetition contracts are subject to certain postpetition events, such as compliance with all terms thereunder. "Dependency on a postpetition event, however, does not prevent a debt from arising prepetition." *Photo Mechanical Servs., Inc. v. E.I. Dupont De Nemours & Co., Inc. (In re Photo Mechanical Servs., Inc.),* 179 B.R. 604, 615 (Bankr.D.Minn.1995). "A debt can be absolutely owing prepetition even though that debt would never have come into existence except for postpetition events." *Gerth,* 991 F.2d at 1434; *accord Sherman v. First City Bank of Dallas (In re United Sciences of Am., Inc.),* 893 F.2d 720, 724 (5th Cir.1990). For purposes of setoff, "a debt arises when all transactions necessary for liabili-

ty occur, regardless of whether the claim was contingent, unliquidated, or unmatured when the petition was filed." *Gerth,* 991 F.2d at 1433. The crucial factor, then, is simply "whether the genesis of each debt was prepetition, that is, whether the events giving rise to the debt occurred before bankruptcy." 1 David G. Epstein et al., *Bankruptcy* § 6–40, at 671 (1992) (citing *Braniff Airways, Inc. v. Exxon Co. U.S.A.,* 814 F.2d 1030, 1036 (5th Cir.1987)). Here, all parties agree that the events giving rise to the debtors' claim for CRP and PFC payments—to wit, their CRP and AMTA program (or PFC) contracts—arose prepetition. The debtors' claim— their right to payment under the contracts— came into existence when their contracts were signed and they were promised payments under the CRP and PFC. *See Gerth,* 991 F.2d at 1434.

connotes entitlement. Once a creditor in a reorganization case has established the necessary preconditions for entitlement to a right of setoff, his right should ordinarily be enforced. Equitable considerations in no way absolve a court from enforcing this right, once it has been established, in cases where such enforcement jeopardizes a debtor's prospects for reorganization. The Court joins the Tenth Circuit Court of Appeals in rejecting the notion "that to allow administrative setoffs in a reorganization is inconsistent with the rehabilitative purpose of the Bankruptcy Code." *In re Turner,* 84 F.3d at 1299.

Lastly, in their resistance to setoff, the debtors direct the Court's attention to a pronouncement by the Court of Appeals for the Eighth Circuit that, "a bankruptcy court may disallow an otherwise proper § 553 setoff if there are compelling reasons for not allowing such a preference." *Bird v. Carl's Grocery Co. (In re NWFX, Inc.),* 864 F.2d 593, 595 (8th Cir.1989). The *Bird* Court did not elaborate on the import of its statement. While it is possible that the passage refers to the statutory exceptions to the right of setoff, as contained within Section 553, or perhaps to instances where illegal or fraudulent conduct are present, it would not seem to apply to the instant matter. This is so, for the judicially-created exception, sheltering reorganizing debtors from otherwise valid rights of setoff, has been effected by bankruptcy courts relying upon Code § 105 for such authority.[5] Yet, in *Bird,* the Eighth Circuit discusses at length the inherent limitations of the equitable powers of the bankruptcy court under Code § 105, as follows:

> Generally, the bankruptcy court possesses only the jurisdiction and powers conferred upon it by Congress, and its broad equitable powers may only be used to further the policies and provisions of the Code.

Section 105(a) provides:

> The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

Unquestionably, § 105 is comparable to the All Writs Statute, 28 U.S.C. § 1651. Its purpose is to allow the bankruptcy court to issue equitable orders such as injunctions and stays and to punish for contempt in cases where such actions are consistent with the provisions of the Code. Section 105 does not empower a bankruptcy court to create new substantive rights.

*Id.* (citations omitted). This discussion reinforces, rather than undercuts, this Court's previous analysis and discussion of FSA's right of setoff. Accordingly, and for all of the reasons just described, the Court will allow FSA its right of setoff against the debtors' anticipated payments under the CRP and PFC.

#### 2. Feasibility

It is the debtors' burden to establish all of the elements essential to the confirmation of a plan, including its feasibility. *See Ames v. Sundance State Bank (In re Ames),* 973 F.2d 849, 851 (10th Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1261, 122 L.Ed.2d 658 (1993). The feasibility requirement pertains to all proposed Chapter 12 plans pursuant to Code § 1225(a)(6), which mandates plan confirmation if "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1225(a)(6); *see Abele v. Webb (In re Webb),* 932 F.2d 155, 157 n. 3 (2d Cir.1991); *In re Kuether,* 158 B.R. 151, 153 (Bankr.D.N.D. 1993). While it is not required that debtors guarantee their plans, "they must provide 'reasonable assurance that the plan can be effectuated.'" *In re Ames,* 973 F.2d at 851 (quoting *First Nat'l Bank v. Hopwood (In re Hopwood),* 124 B.R. 82, 86 (E.D.Mo.1991)). They must, accordingly, prove that their proposed plans are "both realistic and will cash flow." *In re Kuether,* 158 B.R. at 153; *see*

---

**5.** Code § 105 provides in pertinent part that:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process. 11 U.S.C. § 105(a).

*In re Dittmer,* 82 B.R. 1019, 1022 (Bankr. D.N.D.1988).

 In this respect, the Court must scrutinize the terms of the plan, and whether, in light of the debtors' projected income and expenses, the debtors are likely to meet their obligations thereunder. *See Prudential Ins. Co. v. Monnier (In re Monnier),* 755 F.2d 1336, 1341 (8th Cir.1985); *In re Honeyman,* 201 B.R. 533, 537 (Bankr.D.N.D.1996); *In re Foertsch,* 167 B.R. 555, 565 (Bankr. D.N.D.1994); *see also Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson),* 767 F.2d 417, 420 (8th Cir.1985); *In re Harper,* 157 B.R. 858, 866 (Bankr.E.D.Ark.1993). Moreover, the Court must be persuaded of the ability of the plan to cash flow "based upon realistic and objective facts (as opposed to visionary or overly optimistic projections)." *In re Honeyman,* 201 B.R. at 537; *see also In re Ames,* 973 F.2d at 851 (quoting *In re Novak,* 102 B.R. 22, 24 (Bankr.E.D.N.Y. 1989)) ("A plan's 'income projections must be based on concrete evidence and must not be speculative or conjectural.' "); *In re Clarkson,* 767 F.2d at 420 ("the feasibility test is firmly rooted in predictions based on objective fact."). Although it is this Court's practice to grant debtors the benefit of the doubt in matters concerning plan feasibility, *see, e.g. In re Foertsch,* 167 B.R. at 566; *In re Konzak,* 78 B.R. 990, 994 (Bankr.D.N.D. 1987), the Court will not "blindly confirm . . . a plan . . . that is incapable of cash flowing." *In re Dittmer,* 82 B.R. at 1022.

 The debtors' cash flow projections place total future farm expenses at approximately $50,000.00 annually over the life of their modified plans. However, their historical farm expense figures, as contained within the record, exceed this sum by a range of approximately 175% to 220%. The debtors' average actual farm expenses for the years 1994 through 1996 averaged $96,722.73 per annum.

The debtors have not sufficiently explained in their modified plans, briefs to the Court, or testimony, how they will effect such a remarkable transformation in their farming expenses. Instead, in this regard the debtors assert only that they will farm fewer acres than they have in the past, renting out a portion of their acreage rather than farming it; that they will expend less money on chemical purchases, such as fertilizers and pesticides for their crops; and that they will have no need for hired help or machinery to harvest their sunflower crops. They offer no data to bolster their claims that farm expenses will so markedly decrease. Moreover, they indicate in their post-confirmation-hearing brief to the Court that under their modified plans, farm expenses might actually "stay somewhat the same."

In light of the sheer paucity of support which the debtors have offered in explanation of how they hope to effectively halve their yearly annual farm expenses, the Court must accept the debtors' historical farm expense figures as more accurate predictors of their future farm expenses than those contained in their cash flow projections. Significantly, even after eliminating *all* expenses for chemical products, hired help, and machinery rental from their 1994 through 1996 historical expense data, there still remains an average farm expense of $91,076.15 annually over the life of their modified plans.[6] What follows is a year by year feasibility analysis of the debtors' modified plans, incorporating their historical expense data.

The debtors project aggregate 1998 living expenses of $39,000.00, and aggregate plan payments of $7,499.10 to Clara Sauer and FSA. Assuming the debtors' will incur 1998 farm expenses in the amount of $91,076.15, then their plan expenses for 1998 will amount to $137,575.25. Assuming that the debtors in fact achieve their aggregate projected 1998 farm income of $123,269.87, they will be left with a negative cash flow of $14,305.38 for the year.[7]

---

6. After subtracting the described extraneous expenses from the debtors' total expense figures for each of the years 1994, 1995, and 1996, their remaining farm expenses aggregated $85,072.73, $79,611.34, and $108,544.37 respectively, for an average of $91,076.15 over that time.

7. Willard and Joyce would be left with a negative cash flow of $15,109.83, in light of their indebtedness of $804.45 to Norwest Bank on their 1989 Dodge Caravan.

For 1999, the debtors project aggregate living expenses of $39,000.00, and aggregate plan payments of $41,662.02 to Clara Sauer, FSA, Grant County, the Bank of North Dakota, and Community Bank. Assuming the debtors incur 1999 farm expenses of $91,076.15, then their 1999 plan expenses will total $171,738.17. Further assuming that they will achieve their projected aggregate 1999 farm income of $126,600.60, they will be left with a negative cash flow of $45,137.57 for the year.

In the year 2000, the debtors project aggregate living expenses of $39,000.00, and aggregate plan payments of $49,852.36 to Clara Sauer, FSA, Grant County, the Bank of North Dakota, and Community Bank. Assuming the debtors incur farm expenses of $91,076.15 during that time, they will have plan expenses of $179,928.51 for the year. Applying this sum against their projected aggregate farm income of $126,600.60, the debtors will be left with a negative cash flow of $53,327.91 for the year.

However, their overall cash flow situation is even further eroded when the following additional expenses are taken into account: the amount of FSA's setoff during the three plan years, to wit, $22,590.60; their required repayment to Community Bank of $5,844.27 for use of its cash collateral; $3,500.00 to FSA, as provided under the stipulation into which the debtors entered; and any sum which might additionally be due DCB as a result of its adversary proceeding against the debtors. This analysis does not even take into consideration any additional 1998 plan disbursements to Grant County, the Bank of North Dakota, FSA, and to Community Bank, per the objections of FSA and Community Bank in this regard, which would only further increase the debtors' negative cash flow in 1998.

In sum, under an analysis based upon fact rather than fancy, the debtors are left with insufficient net farming income to meet their plan obligations. Their modified plans, as proposed, are thus unconfirmable. All other objections by the parties on this point are accordingly rendered moot.

III. Conclusion

Based upon the foregoing, confirmation of the first modified plans of the debtors, Robert and Gloria Sauer, and Willard and Joyce Sauer, is DENIED.

**SO ORDERED.**