2014 ND 11

**FORBES EQUITY EXCHANGE, INC., Plaintiff and Appellee**

v.

**Keith JENSEN, Defendant and Appellant.**

**No. 20130199.**

Supreme Court of North Dakota.

Jan. 17, 2014.

Rudra Tamm, Bismarck, ND, for plaintiff and appellee.

Ryan C. McCamy (argued) and Benjamin J. Williams (appeared), Fargo, ND, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] Keith Jensen appealed from a judgment entered by the district court following a bench trial on a contract dispute. We affirm, concluding the district court did not err in denying Jensen's claim for an offset or in admitting evidence. We also conclude that the court did not err in finding in favor of Forbes Equity Exchange on its assigned claim against Jensen.

I

[¶ 2] From 1998 through 2009, Jensen owned a cattle feedlot in South Dakota. Jensen did not personally operate the feedlot but utilized it for his cattle-brokering business. Jensen leased the feedlot to Arden Sieh under a five-year written lease agreement. The lease payments were $115,000 per year. The written lease expired in 2003, but Sieh continued to operate the feedlot under an oral lease agreement with Jensen. Throughout the written and oral lease terms, Sieh provided feed and care for cattle corralled at the feedlot that were owned by Jensen and other cattle owners.

[¶ 3] Near the end of the written lease term, Sieh discontinued paying monthly rent payments to Jensen. Rather than making payments, Sieh deducted from his monthly rent payment the amount of money that Jensen owed Sieh for the feed and care services Sieh provided Jensen's cattle at the feedlot. This crediting arrangement continued after the expiration of the written lease. Sieh claimed that, over the course of the arrangement, Jensen's cattle consumed more feed than the amount of money Sieh owed Jensen for rental pay-

ments. In 2009, Sieh ceased operating the feedlot and vacated the property.

[¶ 4] While operating the feedlot, Sieh purchased cattle feed from Forbes Equity Exchange, Inc. ("FEE"), a North Dakota cooperative grain elevator. In 2010, FEE filed a complaint against Sieh and Jensen for $166,015.18 worth of corn purchased by Sieh on an open account that was allegedly never paid. FEE alleged Jensen's cattle consumed the feed.

[¶ 5] In March 2011, FEE withdrew its claim against Sieh for the unpaid feed. In exchange, Sieh assigned to FEE all potential claims he had against Jensen for cattle feed and care services that exceeded Sieh's rent payments. FEE amended its complaint, and raised Sieh's claims for cattle-care costs in addition to its original suit against Jensen for unpaid cattle feed.

[¶ 6] In May 2011, Jensen filed a third-party complaint against Sieh for the collection of past debts, including bounced checks, missed rent payments, unpaid loans and interest, missing cattle, damaged feedlot property, and other financial obligations arising from Sieh's operation of Jensen's feedlot. In December 2011, Sieh filed for Chapter 7 bankruptcy. Sieh included Jensen's third-party claim in his bankruptcy petition. In April 2012, Sieh was discharged of all bankruptcy debts, including Jensen's creditor claim of $3,561,398.09.

[¶ 7] At the November 2012 bench trial, the district court dismissed FEE's claim against Jensen for the unpaid feed, but determined Jensen owed FEE $803,501.48 on its assigned claim for the feed and care Sieh provided Jensen's cattle. The court found "Jensen introduced no credible evidence of any claims against Sieh for 'money loaned' or 'insufficient funds on checks' after the year 2003, when the parties agreed they were 'even.'" The court stated, "[t]he rent that Sieh owed to Jensen was paid by Sieh crediting Jensen for $115,000 per year ... there was no credible evidence that Sieh owed Jensen the Jensen bankruptcy claim of $3,561,398.09, that could be used to setoff against Sieh's claims against Jensen." The court also determined, that even if there was credible evidence of the offsetting claim, the claim was discharged by bankruptcy.

## II

[¶ 8] Our standard of review for an appeal from a bench trial is well-established:

In an appeal from a bench trial, the trial court's findings of fact are reviewed under the clearly erroneous standard of N.D.R.Civ.P. 52(a) and its conclusions of law are fully reviewable. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all the evidence, we are left with a definite and firm conviction a mistake has been made. "In a bench trial, the trial court is 'the determiner of credibility issues and we do not second-guess the trial court on its credibility determinations.'"

*Brash v. Gulleson,* 2013 ND 156, ¶ 7, 835 N.W.2d 798 (internal citations omitted).

## III

[¶ 9] On appeal, Jensen argues that, because Sieh assigned his potential claims against Jensen to FEE before Sieh filed for bankruptcy protection, FEE is subject to all the claims and defenses available to Jensen, including his alleged offset claim. Jensen claims "Sieh's subsequent filing for bankruptcy protection has no bearing or impact upon the assignment, as Jensen's claims and defenses are measured at the time of the assignment." (Emphasis removed). Jensen contends that, be-

cause the assignment was made before the bankruptcy filing, FEE "step[s] into the shoes of Sieh" and cannot claim bankruptcy protection because the filing was made after the assignment.

[¶ 10] As a rule, "an assignee of a chose in action takes subject to any defenses existing at the time of the assignment or before notice of the assignment." *Global Fin. Servs., Inc. v. Duttenhefner,* 1998 ND 53, ¶ 20, 575 N.W.2d 667. "After an assignment, the assignee acquires no greater rights than held by the assignor, and the assignee merely stands in the shoes of the assignor." *Collection Ctr., Inc. v. Bydal,* 2011 ND 63, ¶ 15, 795 N.W.2d 667. "The right of an assignee is subject to any defense or claim of the obligor which accrues before the obligor receives notification of the assignment, but not to defenses or claims which accrue thereafter...." Restatement (Second) of Contracts § 336 (1981). This Court has also stated:

> [b]ecause an assignee acquires no greater rights than were possessed by the assignor, in an action on the claim assigned, the assignee of a chose in action is ordinarily subject to any setoff or counterclaim available to the obligor against the assignor, and to all other defenses and equities that could have been asserted against the assignor at the time of the assignment.

*Bydal,* 2011 ND 63, ¶ 15, 795 N.W.2d 667 (quoting 6 Am.Jur.2d *Assignments* § 116 (2008) (emphasis removed)). Thus, when the rights of the assignor are subject to a setoff at the time of the assignment, the rights of the assignee are also circumscribed by the obligor's right to apply the setoff. *Id.*

[¶ 11] An "offset" is defined as "[s]omething (such as an amount or claim) that balances or compensates for something else...." *Black's Law Dictionary* 1195 (9th ed.2009). "The final equitable concept of 'offset' recognizes that the debtor may satisfy a creditor's claim by acquiring a claim that serves to counterbalance or to compensate for the creditor's claim." *Id.* "'Offset' is synonymous with 'setoff.'" *Dakota Partners, L.L.P. v. Glopak, Inc.,* 2001 ND 168, ¶ 21, 634 N.W.2d 520. A setoff or offset "allows parties that owe mutual debts to each other to assert amounts owed, subtract one from the other, and pay only the balance." *Id.* A valid offset necessitates a mutuality of debt between the parties. *See id.*

[¶ 12] The Bankruptcy Code preserves the rights of creditors to offset mutual debts that arose before the bankruptcy petition was filed; the Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case...." 11 U.S.C. § 553(a) (2012). To establish a right of setoff under 11 U.S.C. § 553(a), the creditor must establish the following three elements:

1. A debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case.

2. The creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case.

3. The debt and the claim are mutual obligations.

*In re Sauer,* 223 B.R. 715, 724 (Bkrtcy. D.N.D.1998). It is necessary that the debt and the claim arose prepetition and are mutual. *Id.*

[¶ 13] Here, it is clear that Sieh assigned to FEE his potential cause of action against Jensen prior to filing his bankruptcy petition. In March 2011, Sieh assigned

to FEE all potential claims Sieh had against Jensen for the costs of cattle-care and operation of the feedlot and pasturing of cattle at Jensen's property. In May 2011, FEE amended its complaint against Jensen to include the claims Sieh had assigned. In December 2011, Sieh filed for bankruptcy. Thus, at the time Sieh assigned FEE his potential contract causes of action, FEE, as the assignee, took the action subject to any defenses or setoffs Jensen could validly claim. *See Duttenhefner*, 1998 ND 53, ¶ 20, 575 N.W.2d 667.

[¶ 14] The district court relied on two rationales for why Jensen's offsetting claim was not proper. First, the court found, "Jensen introduced no credible evidence of claims against Sieh for years after 2003, except rent, for which Sieh credited Jensen." Second, the court reasoned, "[e]ven if there were any claims, such were discharged in the Sieh bankruptcy and are not applicable to FEE." FEE argues the issue of whether the bankruptcy discharge "of Jensen's claims against Sieh also eliminated any Jensen claims against Sieh from being offset against the judgment FEE obtained against Jensen, would become relevant only if there were any valid Jensen claims against Sieh that were not already included in the trial court's determination of damages."

[¶ 15] We conclude that the crux of the district court's ruling is based on its factual determination that Jensen did not possess any valid claims against Sieh for over three-million dollars that could be used as an offset. The court's legal determination that the offset was discharged or moot is auxiliary to its analysis, especially in light of its "even if" language. Here, the district court found that Jensen presented no credible claims at trial, and the claim of a setoff was not based on facts existing at the time of the assignment.

*See Bydal*, 2011 ND 63, ¶ 15, 795 N.W.2d 667 (stating "[a]n assignee's right against the obligor is subject . . . to all set-offs and counterclaims of the obligor which would have been available against the obligee had there been no assignment, provided that such defenses and set-offs are based on facts existing at the time of the assignment. . . ."). Even in bankruptcy, the right of setoff is only available where a mutual debt exists prior to the commencement of the bankruptcy case. *In re Sauer*, 223 B.R. 715, 724 (Bkrtcy.D.N.D.1998). Because the court found no mutual debt existed, setoff could not be available.

[¶ 16] The court's finding that there was no amount or claim to counterbalance or offset FEE's claim against Jensen was a factual finding. Factual findings are reviewed under the clearly erroneous standard. *Brash*, 2013 ND 156, ¶ 7, 835 N.W.2d 798. Applying the facts, Sieh testified that, toward the end of the written lease agreement in the spring of 2003, he and Jensen did not owe each other financially, "[i]t was relatively close to even." Joy Jensen, Jensen's wife and bookkeeper, also testified that financial concerns between the Jensens and Sieh were even in March 2003. Cindy Lunders, Sieh's bookkeeper from 2002 through 2008, also testified. Lunders testified she used Quick Books and a computer software program called Pro Mini to record and enter data concerning feed types, rations, veterinary bills, weigh tickets, and to assign animals to specific pens based on ownership. FEE introduced into evidence the daily feed sheets Sieh used to record the type of feed and ration. FEE also introduced into evidence Exhibit # 5, which Lunders described as "a running total from 2003 through 2009 of billings to Keith Jensen, and any payments he had made, any credits he was given for rent, for cattle that were sold to other individuals."

[¶ 17] Exhibit # 5 is comprised of six columns of data. The first column provides the date of bill or payment. The second column is entitled "Billing to KJ," and reflects the costs of cattle services Sieh provided Jensen. The third column, "Payments Made By KJ" reflects the payments or credits Sieh received from Jensen. The fourth column, "Rent Due to KJ" subtracted Sieh's yearly $115,000 rent payment. The fifth and sixth columns, "Yearly Total" and "Running Total" reflected the mathematical summaries and totals of the other columns. The court found, "Cindy Lunders testified that the billings ... in Exhibit # 5 were prepared contemporaneously with the dates on the bills, based on the tickets for cattle coming into and leaving the feed lot, the weigh tickets, the vet sheets, and the feed sheets...." Additionally, the court found that Lunders introduced into evidence nearly every individual bill that was included under the "Billing to KJ" column of Exhibit # 5, along with backup documents related to each bill. The court found Exhibit # 5 and the other documents introduced established that Jensen owed Sieh the amounts in Exhibit # 5.

[¶ 18] Jensen testified he had no objection with the "Payments Made By KJ" column in Exhibit # 5. Jensen testified he disagreed with the amount in the "Billing to KJ," but he did not provide any documentation or evidence to refute the billing numbers. The court found, "[a]lthough Jensen and Joy Jensen testified that they disagreed with some of the bills on the 'Billing to KJ' column of Exhibit P–5, neither specified with which bills they disagreed, or in what manner the bills are inaccurate." Additionally, "Jensen offered no evidence as to what should be the correct billing from Sieh to Jensen, and introduced no documentation to discredit the Exhibit P–5 summary, or any of the bills

from Sieh to Jensen that Lunders introduced into evidence."

[¶ 19] Based on this evidence, we conclude the district court did not err in finding Jensen was unable to produce any satisfactory evidence for an offset. The trial court had adequate opportunity to weigh the evidence and credibility of the witnesses as well as their claims. There is ample evidence to support the court's finding that Jensen did not introduce any credible evidence of any claims against Sieh "in the total amount of $3,561,398.09 for past due debts, including bounced checks, missed rent payments, unpaid loans with interest, missing cattle, damaged or missing feedlot property...." Because we conclude the district court's finding is not clearly erroneous that Jensen failed to introduce any credible evidence of an offset claim against Sieh, we need not answer whether the district court erred in its ancillary finding that, even if there was an offset, the Jensen claim against Sieh was discharged by Sieh's bankruptcy. *See Wahl v. Morton Cnty. Soc. Servs.*, 1998 ND 48, ¶ 27, 574 N.W.2d 859 (stating, "[q]uestions, the answers to which are not necessary to the determination of an appeal, need not be considered.").

IV

[¶ 20] Jensen argues the district court erred in admitting FEE's Exhibit # 5 summary evidence without requiring production of the underlying documents. Jensen contends that certain binders containing invoices unique to Jensen were not produced during discovery or at trial. Exhibit # 5 was initially introduced for identification purposes only, but was received as a full exhibit after foundation for its admission had been laid with the admission of Exhibits # 6 through # 57. Exhibits # 6 through # 57 were comprised of numerous

billing documents that corresponded with the Exhibit # 5 summary.

[¶ 21] Jensen essentially alleges that Exhibit # 5 and its supporting documents do not accurately reflect the financial and business dealings between Sieh and Jensen because they do not include Jensen's billing invoices. Jensen often purchased and sold livestock in quick succession as part of his cattle brokering business. He claims that "in the frequent situation where cattle purchased by Jensen were ultimately sold to another party who paid the feed and care bill, Ms. Lunders purportedly went through Jensen's billings and subtracted out the feed and care charges by making handwritten notations on the 'Pro Mini' generated invoices...." The alleged billing revisions could not be made on the Pro Mini computer program, but had to be manually backed out and written in by hand. According to Jensen, "[t]his backing out could not be verified before, during, or after trial because the underlying 'Pro Mini' generated invoices for Jensen on which the back outs were recorded have never been produced." Jensen alleges, "[t]he 'Pro Mini' generated invoices for Jensen are also the only source of information showing the amount of feed consumed by Jensen cattle, the cost of said feed, whether the feed was attributed to another customer through a back out, and whether the invoice was sent to Jensen."

[¶ 22] Jensen did not file a motion to compel production of the alleged binders. At trial, Jensen filed a motion in limine to exclude Exhibit # 5, "based on a failure to provide the underlying documents on which the summaries were based." The court denied his motion and also denied his objection at trial. The court stated, "[w]ith respect to those documents, the binders and so forth, you know, these things should have been at least tried to focus on in discovery." The court also stated that the supporting documents produced at trial gave "credence with respect to the [Exhibit # 5] Summary because everyone of them is listed there," and the "[documents] match date for date and amount for amount." In its order for judgment, the court found that FEE introduced into evidence nearly every one of the individual bills to Jensen that were included in the "Billing to KJ" column of Exhibit # 5, along with backup documents available for each bill introduced as Exhibits # 6 through # 57. Additionally, the court found that Jensen offered no evidence as to what should be the correct billing from Sieh to Jensen, and no documentation to discredit Exhibit # 5 or any of its supporting bills.

[¶ 23] In reviewing the decision of a district court concerning evidentiary matters, this Court has stated, "we will not overturn its admission or exclusion of evidence on appeal unless that discretion has been abused." *Schwab v. Zajac*, 2012 ND 239, ¶ 19, 823 N.W.2d 737. The burden is on the party seeking relief to affirmatively establish an abuse of discretion. *Nesvig v. Nesvig*, 2006 ND 66, ¶ 12, 712 N.W.2d 299. "The district court abuses its discretion only when it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not the product of a rational mental process leading to a reasoned determination." *Id.* North Dakota Rule of Evidence 1006 provides that the contents of voluminous writings, which cannot conveniently be examined in court, may be presented in the form of a chart or summary. The originals or duplicates are to be made available for examination by other parties at a reasonable time and place. The court may order that they be produced in court.

[¶ 24] We conclude the court did not err in admitting Exhibit # 5 or its supporting documents. Exhibit # 5 was admitted,

based on the underlying documentation and support provided in Exhibits # 6 through # 57. The court admitted Exhibit # 5 after a foundation had been laid by Exhibits # 6 through # 57. Jensen was given the opportunity to review the supporting documents at trial. To the extent that N.D.R.Ev. 1006 applies, it was complied with. Upon our review of the record, we conclude the district court did not act in an arbitrary, unreasonable or capricious manner or misinterpret the law in admitting FEE's summary evidence.

## V

[¶ 25] Jensen also argues the district court erred in finding in favor of FEE on its assigned claim against Jensen. Whether the district court erred in finding in favor of FEE is viewed under the clearly erroneous standard. The district court "accepted all the claims by Sieh for cattle feeding and other services to Jensen from 2004 until the end of 2008, and deducted the amount of rent due to Jensen for the feedlot, the payments Jensen made for the feeding ... and the loans made to Sieh."

[¶ 26] The ruling of the district court is not clearly erroneous for many of the reasons that were discussed in Section III of this opinion. Both parties testified they were financially even in 2003. Lunders introduced into evidence numerous exhibits including daily feed sheets and individual bills. These exhibits were summarized by Exhibit # 5. The court found Exhibit # 5, along with its supporting evidence, "established that Jensen owed Sieh the amounts on Exhibit # 5." Jensen offered no evidence to discredit Exhibit # 5. Finally, Jensen was unable to introduce any credible evidence of any claim against Sieh for "money loaned" or "insufficient funds on checks" after 2003, the year the parties agreed they were financially "even." We conclude the court did not err in finding in favor of FEE on its assigned claim against Jensen.

## VI

[¶ 27] We affirm the judgment of the district court.

[¶ 28] MARY MUEHLEN MARING, S.J., GARY H. LEE, D.J., DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.

[¶ 29] The Honorable GARY H. LEE, D.J., sitting in place of CROTHERS, J., disqualified.

[¶ 30] The Honorable LISA FAIR McEVERS was not a member of the Court when this case was heard and did not participate in this decision. Surrogate Judge MARY MUEHLEN MARING, sitting.