RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18b0002p.06

# BANKRUPTCY APPELLATE PANEL

## OF THE SIXTH CIRCUIT

In re: TONY DIAN PERKINS,

                       *Debtor.*               Nos. 17-8001/8008

On Appeal from the United States Bankruptcy Court
for the Western District of Kentucky at Bowling Green.
No. 16-10383—Joan A. Lloyd, Judge.

Argued: November 14, 2017

Decided and Filed: March 13, 2018

Before: DELK, HARRISON and HUMPHREY, Bankruptcy Appellate Panel Judges.

_____

## COUNSEL

**ARGUED:** Brian R. Pollock, STITES & HARBISON PLLC, Louisville, Kentucky, for Appellant. Sandra D. Freeburger, DEITZ, SHIELDS & FREEBURGER, LLP, Henderson, Kentucky, for Appellee. **ON BRIEF:** Brian R. Pollock, STITES & HARBISON PLLC, Louisville, Kentucky, for Appellant. Sandra D. Freeburger, DEITZ, SHIELDS & FREEBURGER, LLP, Henderson, Kentucky, for Appellee.

_____

## OPINION

_____

GUY R. HUMPHREY, Bankruptcy Appellate Panel Judge. In these consolidated appeals, SummitBridge National Investments V LLC ("SummitBridge") appeals the Bankruptcy Court for the Western District of Kentucky's Memorandum-Opinion overruling Branch Banking

& Trust Co.'s ("BB&T")[1] objection to the confirmation of Tony Dian Perkins' ("Perkins") Chapter 12 plan, and the subsequent order confirming that plan.

Chapter 12 relief is only available to family farmers or family fisherman. 11 U.S.C. § 109(f). A family farmer is an "individual . . . engaged in a farming operation whose aggregate debts do not exceed $4,153,150,"[2] and who receives more than half of her gross income from "such farming operation." 11 U.S.C. § 101(18)(A). SummitBridge contends that the bankruptcy court improperly found Perkins to be a family farmer, arguing that Perkins both exceeded the "aggregate debt" limit and did not receive more than half of her income from her farming operation. In the alternative, SummitBridge argues that even if Perkins qualified for Chapter 12 relief, Perkins' plan should not have been confirmed because it was not feasible, provided improper treatment to BB&T's secured claim, and failed to meet the best interests of creditors test. We reject SummitBridge's arguments and affirm the bankruptcy court.

## ISSUES ON APPEAL

1. How is "aggregate debt" calculated in determining a farmer's eligibility for Chapter 12 relief?

2. In determining a farmer's eligibility for Chapter 12 relief, can partnership income received by the individual debtor from the liquidation of separate farming partnerships and from an S corporation constitute income from "such farming operation" when the partnerships and S corporation are not being reorganized in the Chapter 12 case?

3. Did the bankruptcy court err by confirming the Chapter 12 plan in finding the plan was feasible, met the best interest of creditors test, and provided appropriate treatment to the BB&T secured claim?

---

[1]BB&T was the original appellant. However before briefing commenced, BB&T assigned its claims to SummitBridge, who has been substituted as the appellant.

[2]This statutory amount became effective April 1, 2016, per § 104(a).

## JURISDICTION

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Western District of Kentucky has authorized appeals to the Panel, and neither party has timely elected to have this appeal heard by the district court. 28 U.S.C. §§ 158(b)(6), (c)(1). A final order of the bankruptcy court may be appealed as of right pursuant to 28 U.S.C. § 158(a)(1). For purposes of appeal, a final order "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations omitted). An order confirming a plan is a final order. *Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1692 (2015) (citing 11 U.S.C. § 1327(a); *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275, 130 S. Ct. 1367 (2010)); *Burden v. Seafort* (*In re Seafort*), 437 B.R. 204, 206 (B.A.P. 6th Cir. 2010) (citing *Gen. Elec. Credit Equities, Inc. v. Brice Rd. Devs., LLC* (*In re Brice Rd. Devs., LLC*), 392 B.R. 274, 278 (B.A.P. 6th Cir. 2008)).

## STANDARD OF REVIEW

Conclusions of law are reviewed de novo. *Mediofactoring v. McDermott* (*In re Connolly N. Am., LLC*), 802 F.3d 810, 814 (6th Cir. 2015) (citations omitted); *Isaacs v. DBI-ASG Coinvester Fund III, LLC* (*In re Isaacs*), 569 B.R. 135, 139 (B.A.P. 6th Cir. 2017) (citation omitted). "Under a *de novo* standard of review, the reviewing court decides an issue independently of, and without deference to, the trial court's determination." *Matteson v. Bank of Am., N.A.* (*In re Matteson*), 535 B.R. 156, 159 (B.A.P. 6th Cir. 2015) (citation omitted).

On the other hand, "[f]indings of fact . . . must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6); s*ee Sutter v. U.S. Nat'l Bank* (*In re Sutter*), 665 F.3d 722, 728 (6th Cir. 2012); *In re Aubiel*, 534 B.R. 300, 302 (B.A.P. 6th Cir. 2015) (quoting *Lester v. Storey* (*In re Lester*), 141 B.R. 157, 160 (S.D. Ohio 1991)).

"Factual findings are clearly erroneous only when the reviewing court 'is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Ray*, 803 F.3d 244, 265 (6th Cir. 2015) (quoting *United States v. Navarro-Camacho,* 186 F.3d 701, 705 (6th

Cir. 1999)).  A finding of fact "is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948)). "Inconsistencies alone do not demonstrate clearly erroneous findings."  Q.*W. ex rel. M.W. v. Bd. of Educ. of Fayette Cty., Ky*., 630 F. App'x 580, 583 (6th Cir. 2015).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S. Ct. 1504, 1511 (1985) (citations omitted).  Findings of good faith and feasibility are factual determinations, which we review for clear error.  *See In re Gentry*, 807 F.3d 1222, 1225 (10th Cir. 2015) ("Because a plan's feasibility is a question of fact, we review for clear error. . . ."); *Lexon Ins. Co. v. Naser*, 781 F.3d 335, 342 (6th Cir. 2015).

For bankruptcy issues implicating both factual findings and legal holdings, reviewing courts "must break it down into its constituent parts and apply the appropriate standard of review for each part."  *Bank of Montreal v. Official Comm. of Unsecured Creditors* (*In re Am. HomePatient, Inc*.), 420 F.3d 559, 563 (6th Cir. 2005), *reh'g. denied* (citations and internal quotation marks omitted).  "A mixed question asks whether 'the historical facts . . . satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.'"  *U.S. Bank Nat. Ass'n ex rel. CWCaptial Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, No. 15-1509, 2018 WL 1143822, at *5 (U.S. Mar. 5, 2018) (quoting *Pullman– Standard v. Swint*, 456 U.S. 273, 289, n.19, 102 S.Ct. 1781 (1982)).  "When an 'issue falls somewhere between a pristine legal standard and a simple historical fact,' the standard of review often reflects which 'judicial actor is better positioned' to make the decision."  *Id.* (quoting *Miller v. Fenton*, 474 U.S. 104, 114, 106 S.Ct. 445 (1985)).  "[T]he standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work." *Id.*

**FACTS**

Perkins operates a farm on 200 acres of prime land in southern Kentucky first purchased by her grandparents in 1948.  She has played an active role in farming this land since 1970, when

she married and the couple began farming the land in partnership with her parents. In the intervening years, the farming operation expanded to cultivate approximately 9,500 acres in various partnerships with their son. Perkins' husband retired from farming operations after becoming seriously ill in 2008. Perkins and her husband lived on the farm until their home was destroyed by a tornado in 2013.

Perkins encountered financial trouble in 2014 when high input prices and low crop prices combined to force the partnerships to begin talks with BB&T concerning the downsizing of their operation. These circumstances eventually led to the partnerships' filing of Chapter 11 bankruptcy cases.[3] In 2015, in the midst of this restructuring, Perkins retired from her job as a teacher to run the farm and care for her husband. The Chapter 11 bankruptcies were dismissed after liquidating substantially all of the partnerships' assets and making over four million dollars of payments to BB&T.[4]

On April 25, 2016 Perkins filed for Chapter 12 bankruptcy protection,[5] listing a total of $3,513,803.72 of secured and unsecured debts in Schedule E/F.[6] As of the date of the confirmation hearing, proofs of claim filed by creditors totaled $4,012,908.79 for debts owed on the petition date. In the preceding tax year, Perkins received $279,000 of gross income from her own farm, $764,472 from her farm partnerships with her son,[7] $161,571 of capital gains from the sale of farm equipment, and $132,360 from wages, a pension, and social security.

Perkins filed her Chapter 12 plan, and BB&T objected to confirmation of the plan, as later amended. The bankruptcy court held the confirmation hearing on October 19, 2016, with BB&T being the only party contesting confirmation of the plan. Perkins' amended plan

---

[3]Both partnership cases were filed in the Bankruptcy Court for the Western District of Kentucky on April 16, 2015, *In re Perkins and Perkins Farms*, Case No. 15-10383, and *In re Rolling Ridge Farms*, Case No. 15-10384.

[4]*In re Perkins and Perkins Farms* was dismissed January 12, 2016, and *In re Rolling Ridge Farms* was dismissed on May 10, 2016.

[5]Debtor's son filed a separate Chapter 12 case to address his liability for the partnership debts.

[6]Perkins initially scheduled $3,476,854.01 of debts. However, she later amended Schedule F to include $36,949.71 owed to the Internal Revenue Service.

[7]This income includes $100,234 from Whitlock Farms Inc., an S corporation owned by Perkins and her son, whose sole source of income is its one third partnership share in Perkins and Perkins Farms.

projected gross income of $784,137 from corn and a double crop of wheat and soy as well as rent from leasing land, a drying barn, and other outbuildings to her son's tobacco growing operation. Perkins' farm income is supplemented by $84,000 of retirement income. After deducting operating and living expenses, Perkins' budget would pay $184,000 on secured debts each year leaving $18,950 of disposable income to be paid to unsecured creditors each year over the plan's five-year life. The liquidation analysis accompanying the plan projected that a Chapter 7 liquidation would produce no payments to general unsecured creditors. The amended plan proposed to pay BB&T's claim in annual instalments over 20 years at 4.5% interest, with the first installment due January 2017.

Perkins called two witnesses at the confirmation hearing: her son, who testified as the farm manager regarding feasibility of the plan; and herself, testifying as to her debts and income pertaining to eligibility for Chapter 12 relief. BB&T called no witnesses. The bankruptcy court took the matter under advisement and on December 22, 2016, entered a Memorandum Opinion overruling BB&T's objection and ordering Perkins to tender an order confirming her plan. The confirmation order was entered on February 24, 2017.

## DISCUSSION

SummitBridge has asserted seven assignments of error in its appeal, which the Panel will address in two groups—first, the arguments that Perkins is ineligible for Chapter 12 bankruptcy relief and, second, the arguments that the plan should not have been confirmed due to lack of feasibility, improper treatment of BB&T's claims, and failure to meet the best interest of creditors test.

**I.      Perkins Meets the Code's Definition of Family Farmer and Therefore Is Eligible for Chapter 12 Bankruptcy Relief**

Chapter 12 of the Bankruptcy Code was enacted to "give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land." H.R. Conf. Rep. No. 99-958, at 48 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5246, 5249. Prior to the enactment of Chapter 12, family farmers could proceed under either Chapter 11 or Chapter 13 of the Code. Unfortunately, most family farmers were burdened with too much debt to qualify for Chapter 13

protection, and Chapter 11 was "needlessly complicated, unduly time-consuming, inordinately expensive and, in too many cases, unworkable." *Id.* To avoid Chapter 11's needless complexity and expense, Congress "closely modeled [Chapter 12] after existing Chapter 13," while relaxing the debt limits and filing deadlines that had left farmers ineligible for Chapter 13. *Id. See also In re Shannon*, 100 B.R. 913, 934 (S.D. Ohio 1989).

Section 109 of Title 11[8] defines who may be a debtor under the various chapters of the Code, including Chapter 12: "[o]nly a family farmer or family fisherman with regular annual income may be a debtor under chapter 12 of this title." 11 U.S.C. § 109(f). Section 101(18)(A) defines a "family farmer" as an:

> individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $4,153,150 and not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for—
>
> (i) the taxable year preceding; or
>
> (ii) each of the 2d and 3d taxable years preceding the taxable year in which the case concerning such individual or such individual and spouse was filed[.]

Thus, § 101(18)(A) provides three elements which must be met for a particular time period in order for an individual to be considered a family farmer: first, the individual's "aggregate debts" (the "aggregate debt limit") may not exceed $4,153,150; second, more than 50% of the individual's aggregate noncontingent, liquidated debts (excluding a debt for the principal residence unless such debt arises out of a farming operation), must be farm debt; and third, more than 50% of the individual's income must be farm income. SummitBridge contends that the bankruptcy court erred in finding that Perkins met the first and third requirements.

---

[8]Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

**A.　　The Bankruptcy Court Did Not Err in Determining that Perkins Did Not Exceed the Aggregate Debt Limit for Family Farmers**

Neither the Sixth Circuit nor the Bankruptcy Appellate Panel has addressed how to compute the aggregate debt limit under Chapter 12. The bankruptcy court applied the standard used in *In re Labig*, 74 B.R. 507 (Bankr. S.D. Ohio 1987). While recognizing that the Sixth Circuit articulated a standard to determine Chapter 13 eligibility in *Comprehensive Accounting Corp. v. Pearson* (*In re Pearson*), 773 F.2d 751 (6th Cir. 1985), the *Labig* court created a different standard for Chapter 12:

> While time is very important in chapter 12, the temporal constraints on the bankruptcy court are not as severe as in chapter 13. Therefore, this court believes sufficient time exists to conduct inquiries (upon good faith objections of interested parties) into the eligibility requirements of chapter 12.
>
> At this juncture in the development of chapter 12 case law, this court will view the debtors' schedules as creating a rebuttable presumption regarding the amount of debt owed by the debtors.

*Labig* at 509. In applying the *Labig* standard, the bankruptcy court took evidence at the confirmation hearing concerning Perkins' debts on the petition date, found Perkins filed the schedules in good faith, and rejected BB&T's argument that the court should consider both the scheduled claims, even if such creditors did not file proofs of claim, and the additional claims for which proofs of claim were filed:

> BB&T argues the Debtor's substantial tax liability arising from the liquidation of her other partnerships should be taken into consideration by the Court. Debtor failed to schedule the tax debt but the IRS filed claims and the Debtor's Amended Plan included said debt. The Amended Plan of the Debtor states Debtor owes $113,071 to the IRS and proposes to pay it in semi-annual installments with interest at the government rate. Even including the IRS liability of $113,071 as Debtor's stated tax liability, Debtor is still under the eligibility debt limit for Chapter 12 if the Court uses the scheduled debt only. Yet, if the Court were to use BB&T's analysis of including the amounts of the Proofs of Claim, as well as the $640,408 of unsecured debts for which no Proofs of Claim were filed, Debtor is over the limit.
>
> The Court finds it inequitable to use the amounts on the Proofs of Claim, as well as the scheduled amounts on which no Proofs of Claim were filed. In Chapter 12 cases, an unsecured creditor must file a timely proof of claim in order

to participate in the distributions.  Congress could not have intended the debt limit determination to include the tortured analysis put forth by BB&T.  Including debts scheduled but not allowed, to claims filed to determine eligibility, amounts to "cherry picking" to the disadvantage of the Debtor.  Absent evidence of bad faith and clear mandatory precedent directing otherwise, the Court determines it has the discretion to use the Petition date to determine aggregate debt limit eligibility.

*In re Perkins*, 563 B.R. 229**,** 236 (Bankr. W.D. Ky. 2016) (citations omitted).

SummitBridge argues that the bankruptcy court erred in its approach to determining Perkins' aggregate debt for eligibility purposes.  It argues that we should apply the standard espoused by a bankruptcy court in the 7th Circuit, counting the amount of the claims filed against the debtor, in addition to the scheduled claims, to determine if they exceed the aggregate debt limit.  *See In re Clark*, 550 B.R. 429, 433 (Bankr. N.D. Ind. 2016).  In holding that a court may go beyond debtors' scheduled debts to determine eligibility for Chapter 12, *Clark* relied on *In re Arcella-Coffman*, another bankruptcy case within the 7th Circuit that did not follow *Pearson*. *Id.* at 432 (citing *In re Arcella-Coffman,* 318 B.R. 463, 474 (Bankr. N.D. Ind. 2004) ("This Court will not adopt the *Pearson* standard."))[9]  Thus, SummitBridge asserts that to determine Chapter 12 eligibility, bankruptcy courts should reconcile the claims scheduled by the debtor with the claims filed by creditors, adding any filed proofs of claim which were not scheduled to the scheduled claims, while counting any claims scheduled by the debtor for which no proofs of claim were filed.  This method would result in the highest possible number for aggregate debts of the debtor.  In many cases, it would also significantly add to the time and expense involved in determining a debtor's eligibility by requiring the claims analysis process to be completed before eligibility could be finally determined.[10]

---

[9]Indeed, as explained later in this section, *Arcella-Coffman's* holding seems to have been made based upon a mischaracterization of *Pearson's* holding.  Moreover, this holding may not even be the law of the 7th Circuit. *See In re Lybrook*, 951 F.2d 136, 139 (7th Cir. 1991) (Posner, J.) (citing *Pearson*, 773 F.2d at 757–758) ("Jurisdiction is determined by good-faith allegations rather than by what the evidence eventually shows.") (superseded by statute on other grounds); *In re Turner*, 574 F.3d 349, 355 (7th Cir. 2009) (Posner, J.) (citing *Pearson's* holding with approval in dicta).

[10]The claims allowance process entails first the scheduling of assets and debts by the debtor. Fed. R. Bankr. P. 1007(b)(1)(A). Creditors may file proofs of claim evidencing their debts. 11 U.S.C. § 501. The deadline in this case was 90 days following the § 341 meeting of creditors. Fed. R. Bankr. P. 3002(c) (2008) (amended 2017) (The current bar date, with limited exceptions not relevant here, is 70 days after the petition date. *Id.* (*eff.* Dec. 1,

In *Pearson*, the Sixth Circuit considered "the nature and scope of our judicial inquiry to determine Chapter 13 eligibility," 773 F.3d at 756, and held that "Chapter 13 eligibility should normally be determined by the debtor's schedules checking only to see if the schedules were made in good faith." *Id.* at 757. Thus, the Court of Appeals provided for a simple, economical, and efficient approach to determining eligibility for Chapter 13 bankruptcy cases. Given the similar eligibility requirements for Chapter 13 debtors and family farmers provided by § 109(e) and (f), respectively,[11] and the similar policy concerns arising in Chapter 13 and Chapter 12 cases, *Pearson*'s holding is just as relevant for Chapter 12. So as with Chapter 13 cases, eligibility for Chapter 12 should normally be determined by the debtor's schedules, checking only to see if the schedules were made in good faith.

*Pearson* analyzed § 109(e)'s eligibility determination for Chapter 13 eligibility, noting that it was based on the debtor's debts as of the petition date and "states nothing about computing eligibility after a hearing on the merits of the claims." 773 F.2d at 756. The court explained § 109(e)'s debt limits as Congress' drawing a sharp, but arbitrary line indicating a preference for efficiency without expecting "absolute certainty." *Id.* at 757. Based on these statutory hallmarks, *Pearson* analogized § 109(e)'s eligibility requirements to 28 U.S.C. § 1332's amount in controversy requirement for diversity jurisdiction. *Id.* In both eligibility determinations, "Congress intended to limit the class of persons who might avail themselves of access to the federal forum" without allowing threshold eligibility determinations to "dominate the proceedings themselves nor to delay them unduly." *Id.* The court reasoned that an efficient eligibility determination is more important in a Chapter 13 context because time is of the essence, and "resources of the debtor are almost by definition limited" and therefore "an extensive inquiry in each case would do much toward defeating the very object of the statute."

---

2017). The § 341 meeting was scheduled 46 days after the petition date. Parties in interest may then object to filed proofs of claim. § 502; Fed. R. Bankr. P. 3007. Finally, a bankruptcy court may make a determination of validity of the claims for which objections have been filed. § 502. In addition, a party in interest may move for reconsideration of an order allowing or disallowing a claim at any time. Fed. R. Bankr. P. 3008. When an objection to a claim is filed, this process results in a contested matter with discovery being available to the parties in interest throughout this process. *See* Fed. R. Bankr. P. 9014; *Teta v. Chow* (*In re TWL Corp.*), 712 F.3d 886, 892 (5th Cir. 2013); *Gentry v. Siegel*, 668 F.3d 83, 92 (4th Cir. 2012). Needless to say, the claims allowance process can involve a lengthy, expensive process.

[11] And by implication § 101(18) and (19), defining "family farmer."

*Id. Pearson* held that because Chapter 13 eligibility under § 109(e) was subject to the same policy concerns as 28 U.S.C. § 1332, "the same basic approach" used to determine the amount in controversy would be "both workable and fair" to determine Chapter 13 eligibility. *Id.*

The family farmer aggregate debt limit bears the same statutory hallmarks that make § 109(e) analogous to the amount in controversy determination: (1) it is based on the petition date, *In re Quintana*, 107 B.R. 234, 236 n.2 (B.A.P. 9th Cir. 1989), *aff'd*, 915 F.2d 513 (9th Cir. 1990) (citing *In re Carpenter*, 79 B.R. 316, 320 (Bankr. S.D. Ohio 1987)); *In re Labig*, 74 B.R. 507, 509 (Bankr. S.D. Ohio 1987), (2) it "states nothing about computing eligibility after a hearing on the merits of the claims," *Pearson,* 773 F.2d at 756, and (3) it sets a sharp, but arbitrary line for eligibility.[12]

*Pearson* cited limited debtor resources and short deadlines for Chapter 13 filings as important policy considerations requiring efficient Chapter 13 eligibility determinations. These policy concerns are as relevant for Chapter 12 debtors. The resources of Chapter 12 debtors are just as limited as those of Chapter 13 debtors—every dollar debtors spend litigating eligibility is a dollar that can no longer be distributed to unsecured creditors. Under § 506(b), over-secured creditors may be entitled to reasonable attorney fees to collect on their claim, further reducing the amount available to unsecured creditors. *See, e.g., Mfgs. Natl. Bank v. Auto Specialties Mfg. Co.* (*In re Auto Specialties Mfg. Co.*), 18 F.3d 358, 360 (6th Cir. 1994) (citation omitted).

Federal Rule of Bankruptcy Procedure 3015 requires a Chapter 13 debtor to file a plan within 14 days of the petition date, and § 1326 requires the debtors to commence plan payments 30 days from the earlier of the order of relief or the filing of the Chapter 13 plan. Fed. R. Bankr. P. 3015; 11 U.S.C. § 1326(a). In contrast, § 1221 requires Chapter 12 debtors to file their plan within 90 days after the order for relief is entered, and § 1226 contemplates, but does not require, preconfirmation plan payments. *See Stahn v. Haeckel*, 920 F.2d 555, 557–58 (8th Cir. 1990) (holding that because § 1226 contains procedures for dealing with preconfirmation payments, a

---

[12]The dollar amounts set in §§ 109(e) and 101(18) are both subject to inflation adjustments every three years under § 104. The unadjusted debt limits for Chapter 13 are $250,000 for unsecured debts, and $750,000 for secured debts. Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 108, 108 Stat. 4106, 4111–12. The unadjusted family farmer debt limit is $1,500,000. Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, PL 99–554, § 251 100 Stat. 3088, 3104.

bankruptcy court may require a Chapter 12 debtor to make them). Despite being longer, the timeframes involved in Chapter 12 bankruptcy are more of a concern.

First, the time at which a debtor must commence payments is not particularly relevant. While § 1326(a)(1) requires Chapter 13 debtors to make pre-confirmation payments, § 1326(a)(2) requires those funds to be returned to the debtor in the event that the plan is not confirmed.[13] Second, though Chapter 12 debtors have additional time to file their plan, their individually-tailored plans are more complicated than the form plans required under Chapter 13.[14] While plan payments can be returned, the resources spent preparing a plan cannot. Third, while a court may continue hearings and extend deadlines and the automatic stay buys time with creditors, there are no procedural tools to stay the changing of the seasons or extend the deadline to sow fields. In fact, in tailoring Chapter 13 to the needs of farmers, Congress recognized both the extra time that family farmers needed as well as the need to keep the case moving quickly. *See* 132 Cong. Rec. (bound) 28,593 (Oct. 3, 1986) (Statement of Sen Grassley) ("the exclusive period has been reduced to 90 days in the conference approved bill. . . . This will be a powerful incentive to get these cases moving, rather than languishing in the courts.").

Finally, a look at the legislative history of Chapter 12 also suggests the same rule should govern eligibility under § 109(e) and (f). Chapter 12 was closely modeled on Chapter 13, and while not identical, their similarities are extensive. Chapter 12 and Chapter 13 are unique among the types of petitions in that they are the only chapters to have a debt cap as an eligibility requirement. Indeed, Chapter 12's debt cap was greatly raised so that farmers, who tend to carry far more debt than most individuals, could more easily avail themselves of Chapter 13-like protections and avoid the complexity of Chapter 11. Because of the similarity and uniqueness of § 109(e) and (f) and congressional intent to create a more streamlined chapter of bankruptcy for farmers, it would be inappropriate to apply a different method to determine eligibility for the two chapters. For all these reasons, we hold that the holding in *Pearson* should be extended to determinations of eligibility for Chapter 12 cases within the Sixth Circuit.

---

[13]Chapter 12 also provides for the return of plan payments for unconfirmed plans. 11 U.S.C. § 1226.

[14]Bankruptcy Rule 3015(c) requires the use of Official Bankruptcy Form B113 unless a Local Form exists that complies with Bankruptcy Rule 3015.1. There is no equivalent form for a Chapter 12 plan.

Though Chapter 12 precedent is limited, we are not the first court to extend *Pearson* to Chapter 12 eligibility determinations. The 9th Circuit first adopted *Pearson's* holding for Chapter 13 cases in *Scovis v. Henrichsen (In re Scovis)*, 249 F.3d 975, 982 (9th Cir. 2001) ("We now simply and explicitly state the rule for determining Chapter 13 eligibility under § 109(e) to be that eligibility should normally be determined by the debtor's originally filed schedules, checking only to see if the schedules were made in good faith."), and subsequently extended their reasoning to Chapter 12 cases in *Davis v. U.S. Bank, N.A. (In re Davis)*. 778 F.3d 809, 814 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 319 (2015) ("As in *Scovis*, we rely on the schedules."). Some decisions in the 9th Circuit and elsewhere have mischaracterized *Pearson's* holding—"[c]hapter 13 eligibility should normally be determined by the debtor's schedules checking only to see if the schedules were made in good faith." 773 F.2d at 757—as exclusively limiting courts' eligibility determination to the schedules and the good faith of debtors.[15] These decisions fail to account for the word "normally" in that holding. *Pearson* held:

> [I]f, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed, or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.

*Id.* (citing *St. Paul Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–90, 58 S. Ct. 586, 590–91 (1938)). Thus, *Pearson* identified two routes by which a debtor whose scheduled debts are below the debt limit, nonetheless, may be found ineligible. First, if from the face of the schedules it is apparent to a legal certainty that the debtor is beyond the debt limit, and second, if evidence shows that the amounts were inaccurately scheduled in bad faith for the purpose of making the debtor eligible for Chapter 13.

At oral argument, SummitBridge was questioned why eligibility should not be determined early in the case, before parties have expended significant resources pursuing bankruptcy protection. SummitBridge argued for the first time that § 109(f)'s eligibility

---

[15]*See, e.g., Slack v. Wilshire Ins. Co. (In re Slack)*, 187 F.3d 1070, 1073–74 (9th Cir. 1999), as amended (Sept. 9, 1999) (applying *Pearson's* schedule-only approach while allowing courts to second guess debtor's debt calculations if the correct amount of debt is "readily determinable."); *In re Arcella-Coffman,* 318 B.R. 463, 474 (Bankr. N.D. Ind. 2004) (mis-interpreting *Pearson* as holding "the sole focus of the calculation is the debtor's schedules, so long as the schedules were filed in good faith.").

determination is jurisdictional in nature and therefore it was appropriate and incumbent upon the bankruptcy court to determine Perkins's eligibility for Chapter 12 relief at any stage of the bankruptcy case, including after all proofs of claim were filed and the bankruptcy court completed the claims allowance process. We disagree.

The Sixth Circuit has already indicated that § 109(e)'s eligibility requirements are not jurisdictional in nature. In *Glance v. Carroll* (*In re Glance*), 487 F.3d 317, 321 (6th Cir. 2007), the Sixth Circuit cited *Pearson* for the proposition that "the eligibility requirements of § 109(e) create a gateway into the bankruptcy process, not an ongoing limitation on the jurisdiction of the bankruptcy courts." Indeed, *Pearson's* reasoning was based on the emphatically jurisdictional amount in controversy requirement for diversity jurisdiction set by 28 U.S.C. § 1332, which absent a showing of bad faith, is determined at the outset of a case from the allegations of the plaintiff. As we explained earlier in this section, § 109(f) requirements are based on and similar to § 109(e), and we see no reason why it should be treated any differently in regards to its jurisdictional implications.

Having decided our method of determining Perkins' aggregate debt, we must now make a careful determination of what "aggregate debt" means. SummitBridge asserts, without support, that aggregate debt means the aggregate of the face value of all filed proofs of claim and scheduled debts for which no proofs of claim were filed. Nothing in the text of § 101(18)(A) suggests such a broad reading, and neither SummitBridge nor the Panel have been able to locate any authority applying such a broad meaning to aggregate debt.[16] And further, this goes against our holding that *Pearson's* schedules-only eligibility determination applies in Chapter 12. So, to begin our interpretation of the Code, we shall start with the Code itself.

Neither "aggregate" nor "aggregate debt" are defined by the Code. "When a statute does not define a term, we typically 'give the phrase its ordinary meaning.'" *FCC v. AT & T Inc.*, 562 U.S. 397, 403, 131 S. Ct. 1177, 1182 (2011) (quoting *Johnson v. United States*, 559 U.S.

---

[16]SummitBridge cites *In re Clark*, 550 B.R. 429, 432 (Bankr. N.D. Ind. 2016), which held that a debtor was not a family farmer when the total of the proof of claims filed exceed the debt limit. However, *Clark* cannot support SummitBridge's definition of aggregate debt because it neither attempted to define the term nor did it depend on aggregating both scheduled debts and proofs of claims. Moreover, as previously explained, *Clark* depended on 7th Circuit precedent which explicitly contradicts *Pearson*, so we are unpersuaded by it.

133, 138, 130 S. Ct. 1265, 1270 (2010)). The adjective form of aggregate is defined as "taking all units as a whole: formed by adding together two or more amounts" Webster's Third New International Dictionary, Unabridged (2017). But what "two or more amounts" are to be aggregated?

One's first assumption must be that the term "aggregate debt" refers to the unqualified aggregation of all the debtor's debts. However, the unqualified term "debt" already accomplishes that meaning.[17] Aggregate could merely be a superfluous modifier, intensifying the implied inclusiveness of debt, but that would lead to an oxymoron since § 101(18) also refers to the rather less inclusive "aggregate noncontingent, liquidated debts." Another possibility is that the debt limit is aggregating the debts of the "individual and spouse," filing jointly. However, § 101(18)(B), which provides the requirements for a corporation to be a family farmer, does not provide a path for multiple entities to file jointly, but does contain the phrase "aggregate debts."

The better reading is that the debt limit aggregates the debtor's non-farm and farm debts. Without this reading, the aggregate debt limit of § 101(18)—"individual . . . engaged in a farming operation whose aggregate debts do not exceed $4,153,150"—is ambiguous as to whether it applies to the individual or just the farming operation in which the individual engages. Moreover, it is necessary to specify aggregate debts in the aggregate debt limit since the 50% farm debt requirement disaggregates farm debt in order to compare farm debt with non-farm debt.

---

[17]While the Code does not define "aggregate" or "aggregate debt," it defines "debt" as a "liability on a claim," § 101(12), and "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or right to an equitable remedy . . . ." 11 U.S.C. §101(5). The Ninth Circuit B.A.P. emphasized the broad reach of the word "claim" when it held that "[t]he legislative history to Section 101[(5)] emphasizes the broad definition of 'claim' and states that '[b]y this broad definition . . . the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.'" *Quintana v. IRS* (*In re Quintana*), 107 B.R. 234, 237 (B.A.P. 9th Cir. 1989), *aff'd*, 915 F.2d 513 (9th Cir. 1990) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 309 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 21–22 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5807–08, 6266.) (first alteration not in the original).

Next, when the Code aggregates debts for other provisions, it enumerates which debts it aggregates;[18] § 101(18) is no different.  It lists the debts to be aggregated as those arising from the individual and those arising from the farming operation the individual operates.  Finally, this meaning works equally well in the other contexts in which it is utilized by the Code.[19]  Therefore we hold in the context of individuals who are family farmers that "aggregate debt" refers to the aggregate of their farm and non-farm debts.

Looking at the merits, the bankruptcy court reviewed Perkins' schedules and testimony offered by Perkins and found the schedules to have been made in good faith and in an amount below the aggregate debt limit.  BB&T argued that the filed proofs of claim showed that the schedules were not completed in good faith.  The bankruptcy court disagreed, as it had the discretion to do.  BB&T also argued that Perkins failed to schedule the $113,071 tax bill owed to the IRS as a result of liquidating the assets of her partnerships.  Even if the total amount of this unscheduled tax bill was added to Perkins's schedules, it would not put her over the aggregate debt limit.  Further, it does not appear that this debt should be counted towards the debt limit calculation since it does not meet either of the exceptions that *Pearson* identified.  From the face of the schedules, it was not a "legal certainty" that the debt limit had been exceeded.  And after taking evidence, Perkins' failure to schedule the full amount of the IRS claim did not equate with bad faith since there was no "legal certainty" that Perkins owed the entire $113,071 amount to the IRS.  *Pearson,* 773 F.2d at 757 (citation omitted).  Indeed, the IRS itself has demonstrated a lack of certainty as to the amount of the claim by amending the amount of the claim several times since its first proof of claim.  Applying *Pearson* to these facts and the findings of the bankruptcy court, we hold that the bankruptcy court did not err in finding that Perkins did not exceed the aggregate debt limit for Chapter 12 eligibility.

---

[18]*See*, *e.g.*, § 109(e) ("an individual with regular income and such individual's spouse . . . that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $394,725"); and § 303 ("by one or more of such holders that hold in the aggregate at least $15,775 of such claims").

[19]Since it is unlikely that Congress would have intended "aggregate debt" to mean something different for family fishermen than it does for family farmers, we also note that this reading clarifies the language of § 101(19A), though we make no holding as to that section.

**B.**      **The Bankruptcy Court Did Not Err in Determining that Perkins Met the Farm Income Requirement for Family Farmers**

Perkins' eligibility rests on her farm income compared with her non-farm income for 2015.  In order to be eligible as a family farmer under § 101(18), more than 50% of her total income for the particular time period must be from "such farming operation."  Her 2015 tax return showed that she received $279,000 in farm income and $132,360 in non-farm income from wages, pension, and social security.  In addition, she earned $764,472 from her farm partnerships and S corporation and $161,571 of capital gains from the sale of farm equipment.  Perkins' gross income from the farm partnerships and S corporation makes up a large enough portion of her potential income from farming operations that the income she received from capital gains will not affect the outcome of this determination.  SummitBridge argues that her income from the partnerships and the S corporation should not be considered for eligibility purposes because it was not generated from "such farming operation."  It contends that "such farming operation" must refer only to the debtor's farming operation conducted under the Chapter 12 plan and therefore income from winding down Perkins' partnerships and S corporation should not be included as income from "such farming operation."  We disagree.

At the outset, SummitBridge's construction would be impossible to administer.  The Code defines "farming operation" as including "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state."  11 U.S.C. § 101(21). This is a non-exhaustive list intended to be read broadly.  *See In re Fogle*, 87 B.R. 493, 494 (Bankr. N.D. Ohio 1988).  The term "farming operation" is entirely defined in terms of types of activities performed, and noticeably absent from the definition is any way of delineating one farming operation from another.  The definition of "family farmer" provides no more guidance.  Section 101(18)(A) uses the term farming operation four times but only the last includes a qualification:

> individual or individual and spouse **engaged in a farming operation** whose aggregate debts do not exceed $4,153,150 and not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt **arises out of a farming operation**), on the date the case is filed, **arise out of a farming**

> **operation owned or operated by such individual** or such individual and spouse, and such individual or such individual and spouse **receive from such farming operation** more than 50 percent of such individual's or such individual and spouse's gross income for. . . .

11 U.S.C. § 101(18)(A) (emphasis added).  To the extent that "such farming operation" refers to any particular farming operation, it must relate to the one in the preceding clause, i.e., "a farming operation owned or operated by such individual."  Given the term's silence on ownership, and § 101(18)'s mostly unqualified use of the term farming operation, we must conclude that the only particular farming operation which could possibly be the subject of an individual family farmer bankruptcy is one which is either owned or operated by the debtor.

This makes sense given Congress's intent to define "family farmer" and "farming operation" so that "only family farmers-not tax shelters or large corporate entities-will benefit." 132 Cong. Rec. (bound) 28,593 (statement of Sen. Grassley).  Even if the statute did provide some way to delineate one of a debtor's farming operations from another, doing so would frustrate the purpose of the limitation.  The ability of a debtor to take just one farming operation into bankruptcy would allow industrial scale farms to cabin off one section at a time allowing them to meet Chapter 12's demanding requirements piece by piece.  Further, it would seem that defining farming operation as a verb was intended to ensure that only individuals actually engaged in farming, and not passive investors, could avail themselves of Chapter 12 protection.

*In re Hemann* involves very similar facts.  The debtor farmed in partnership with his brother for many years, then decided to downsize, liquidating the partnership and continuing on a smaller scale on his own.  No. 11-00261, 2013 WL 1385404, at *1–2 (Bankr. N.D. Iowa Apr. 3, 2013).  The IRS argued that only income from the farming operation that was being reorganized could be considered for Chapter 12 eligibility purposes, not the income from liquidation of preceding farm operations.  *Id.* at *4.  However, the bankruptcy court held that:

> The *Knudsen* definition of farming operation is broad, encompassing the whole of the Debtor's farming enterprise.  Since the Debtor never stopped farming, but rather merely changed the scope of his operation and the form of entity under which he chose to operate, the Debtor has only one farming operation.  Even if the Debtor had owned multiple entities, for instance one which raised livestock and the other which raised crops, he would still have only one farming operation.

*Id.* at \*7 (citing *Knudsen v. I.R.S.*, 581 F.3d 696, 714 (8th Cir. 2009), *abrogated on other grounds by Hall v. United States*, 566 U.S. 506, 132 S. Ct. 1882 (2012)).

SummitBridge argues that there is no evidence that Perkins was anything more than a silent investor in the farming partnerships with her son. This ignores the findings made by the court that Perkins has been involved in the farm since 1970, and also ignores Perkins' and her son's testimony. BB&T did not offer any evidence to rebut this testimony. We therefore find no clear error in the bankruptcy court's finding.

Perkins' partnership and S corporation income arose from a farm operation owned and operated by her, therefore it is farm income. Since Perkins' gross income from the partnerships was more than her income from all other sources, farm-derived or not, she meets the farm income test of § 101(18)(A). As previously discussed, Perkins' aggregate debt was below the aggregate debt limit. Therefore, the bankruptcy court correctly determined that Perkins was a family farmer eligible for Chapter 12 relief.

## II.     The Bankruptcy Court Did Not Err in Confirming the Plan

Section 1225 of the Code specifies the requirements for a Chapter 12 plan to be confirmed. "A chapter 12 debtor has the burden of proving that his bankruptcy plan meets all confirmation requirements." *United States v. Krause* (*In re Krause*), 261 B.R. 218, 222 (B.A.P. 8th Cir. 2001) (citing *In re Sauer*, 223 B.R. 715, 726 (Bankr. D.N.D. 1998)); *In re Pertuset*, No. 12-8014, 2012 WL 6598444, at \*13, 485 B.R. 478 (B.A.P. 6th Cir. December 18, 2012) (table) (citing *In re Luchenbill*, 112 B.R. 204, 208 (Bankr. E.D. Mich. 1990)). SummitBridge argues that the bankruptcy court required it to show how it would be prejudiced if the plan were confirmed, and by doing so, the court incorrectly placed the burden on the objecting creditor. To the contrary, the bankruptcy court correctly placed the burden of proof on Perkins—the bankruptcy court did not improperly apply the burden of proof merely by giving BB&T an opportunity to provide rebuttal evidence to show that the plan did not treat its claim fairly.

**A.** **The Bankruptcy Court Did Not Err in Finding the Plan Feasible**

Confirming a Chapter 12 plan requires the debtor to prove that "the debtor will be able to make all payments under the plan and to comply with the plan . . . ." 11 U.S.C. § 1225(a)(6).

> "Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment." *In re Howard*, 212 B.R. 864, 878 (Bankr. E.D. Tenn. 1997) (citing *In re Foertsch*, 167 B.R. 555, 566 (Bankr. D.N.D. 1994)). In order to be feasible pursuant to § 1129(a)(11), "[t]he plan does not need to guarantee success, but it must present reasonable assurance of success." *In re Made in Detroit, Inc.*, 299 B.R. 170, 176 (Bankr. E.D. Mich. 2003) (citing *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2nd Cir. 1988)), *aff'd*, 414 F.3d 576 (6th Cir. 2005). In order to sufficiently establish such reasonable assurance, "a plan must provide a realistic and workable framework for reorganization." *Id.* (citing *Crestar Bank v. Walker* (*In re Walker*), 165 B.R. 994, 1004 (E.D. Va. 1994)).

*Gen. Elec. Credit Equities, Inc. v. Brice Rd. Devs. L.L.C.* (*In re Brice Rd. Devs., L.L.C.*), 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008).

SummitBridge argues the plan is unfeasible because it depends on unsustainable yields. The plan projects for 2016: 570 acres of corn at 185 bushels per acre to be sold at $3.75 per bushel, 420 acres of beans at 60 bushels per acre to be sold at $9.75 per bushel, and a crop insurance payment of $85,000 in lieu of a wheat harvest. This brings total projected proceeds from all crops to $726,137.50. At the confirmation hearing, Andy Perkins noted that the harvest was already underway and these numbers were based, in part, on actual results.

SummitBridge argued the plan's projections were "hopeless optimism" depending on changing prices and above-average yields. SummitBridge based this assessment on the farm's results from the year before the bankruptcy filing. In 2015, the farm produced 370 acres of corn at 190 bushels per acre sold at $4.00 per bushel, 380 acres of beans at 45 bushels per acre sold at $9.00 per bushel, and no income from wheat for a total of $335,100 from crops sold in 2015 and an operating loss of $179,000.

The plan calls for planting 990 acres going forward, as opposed to the 750 acres planted in 2015. Cultivating this additional acreage was evidently feasible as the harvest was underway at the time of the confirmation hearing. Next, the plan calls for 185 bushels per acre of corn.

On cross-examination, Andy Perkins testified that he did not doubt SummitBridge's suggestion that on average, farms in the county only grew 135 to 142 bushels of corn per acre, but that according to the Perkins' crop insurance, the farm produced 180 to 190 bushels per acre over the previous 10 years.

SummitBridge also questioned the assumption of 60 bushels per acre for soy beans when in previous years, according to the crop insurance, Perkins only produced 40 to 45 bushels. This question is intertwined with the question of the farm's wheat production. Andy Perkins explained that the farm typically grows a double crop of soy and wheat, with the second harvest of wheat being planted after the soy is harvested. Soy yields are lower when the soy is grown as a double crop with wheat. In 2015 Perkins did not have the proper equipment to sow wheat, and so allowed a neighbor to plant her fields resulting in a reduced yield for soy and no income from wheat. In 2016, it was too wet, so she was able to grow a full harvest of soybeans and received an insurance payment in exchange for planting and plowing over a cover crop such as turnips in place of the wheat. In her deposition, Dian Perkins characterized the $85,000 crop insurance as "only a fraction" of what the wheat income would have been. Finally, Andy Perkins testified that the prices received from 2016's harvest met or exceeded the amounts projected by Perkins' plan.

SummitBridge also took issue with the amended cash flow projection for the months of October 2016–October 2017 contained in amended exhibit 1 to the Amended Plan. The cash flow projected an additional $120,000 for the 2017 harvest. On appeal, SummitBridge alleges that Dian Perkins was unable to explain this extra cash flow. However, in the deposition, Dian Perkins testified that the crop insurance payment received was only a fraction of what the wheat harvest would have been. At the confirmation hearing Andy Perkins testified this higher amount was due to the projected sales of wheat that would begin with the 2017 harvest. This testimony is supported by the title on the cash flow projection, "Dian Perkins Farming Operation w/wheat." Regardless, the additional $120,000 was not taken into account in the amended plan, it does not appear that the bankruptcy court depended on the additional income in its feasibility determination, and the amended plan is feasible even without the additional income.

SummitBridge also argues that the plan is not feasible because it depends on oral leases of land which are unenforceable under the statute of frauds. Perkins' farm consists of 250 acres plus another 805 acres that she leases from various family members for a total of $171,000, or $212 per acre. Perkins testified that she would lease her farmland for $450 per acre and she currently leases 50 acres and some buildings for her son's tobacco farming. The Kentucky statute of frauds provides that:

> No action shall be brought to charge any person:
> * * * *
> (6) Upon any contract for the sale of real estate, or any lease thereof for longer than one year;
> * * * *
> unless the promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged therewith, or by his authorized agent . . . .

Ky. Rev. Stat. § 371.010; *Harper v. Johnson*, 294 S.W.2d 928, 930 (Ky. 1956) (tenant with oral lease for one year acquired right to occupy land for additional year under Kentucky holdover tenant statute). Critically, oral agreements for the lease of land are only unenforceable if they are "for longer than one year." Thus, there is no indication that Perkins' yearly leases are unenforceable.

SummitBridge also contends that these leases make the plan unfeasible because they are not enforceable for the entire term of the plan and are for a below-market rate, and therefore if either the lessors or their descendants decide not to renew the lease, Perkins would no longer be able to sustain her payments. However, this risk is mitigated by Perkins' relationships with the lessors. Two of the lessors are close family relations, and the third is a family friend from whom Perkins has been renting land for 35 years.

On the whole, the plan's projections appear to be based on average yields and obtainable prices for the corn and soy crop, and do not take into account a possible wheat crop which has the potential to bring in more income. While an unforeseen loss of the leased land has the potential to put pressure on Perkins' plan, ultimately, the plan does not need to guarantee

success, but only to provide a reasonable assurance of success. That burden being met, we find no clear error in the bankruptcy court's findings of feasibility.

**B.      The Bankruptcy Court Did Not Err in Finding BB&T's Secured Claim Received Appropriate Treatment under the Code**

Under § 1225(a)(5)(B), a bankruptcy court may confirm a Chapter 12 plan over the objection of a secured creditor which provides for the debtor's retention of the property securing that claim as long as:

> (i) the plan provides that the holder of such claim retain the lien securing such claim; and
>
> (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim;

SummitBridge is retaining its lien under the plan so the only issue is whether its distribution under the plan is not less than the allowed amount of its secured claim. This provision is the same as the requirement for the cramdown of secured claims under a Chapter 11 plan. *See* 11 U.S.C. § 1129(b)(2)(A). It generally requires that any stream of payments to the creditor total at least the amount of its secured claim at an appropriate rate of interest. *See Bank of Montreal v. Official Comm. of Unsecured Creditors* (*In re Am. HomePatient, Inc*.), 420 F.3d 559, 565 (6th Cir. 2005), *cert. denied*, 549 U.S. 942, 127 S. Ct. 55, 166 (2006); *In re White*, 41 B.R. 227, 230 (Bankr. M.D. Tenn. 1984); and *In re Jones*, 534 B.R. 149 (Bankr. E.D. Ky. 2015) (Chapter 13). SummitBridge first asserts that the plan fails in this regard by failing to pay an appropriate rate of interest.

In determining the interest rate in this case, the bankruptcy court employed the formula approach as endorsed by the Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S. 465, 479–80, 124 S. Ct. 1951, 1961–62 (2004). In *Till*, the Court decided that in the context of § 1325(a)(5)(B)(ii),[20] courts should determine the discount rate by taking the national prime rate

---

[20]The wording of § 1325(a)(5)(B)(ii) and § 1225(a)(5)(B)(ii) are identical. It should also be noted that while the Sixth Circuit has held that *Till* does not extend to chapter 11 cases, as discussed in Section I, Chapter 12 is more closely related to Chapter 13. Still, we make no holding that *Till* must be applied in Chapter 12 cases.

and adding risk adjustment which is generally set at 1 to 3%. *Id.* (citations omitted). In addition to being easy to apply, the court found this approach preferable because "starting from a concededly *low* estimate and adjusting *upward* places the evidentiary burden squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing . . . ." *Id.* at 479.

SummitBridge argues that the bankruptcy court erred by failing to make factual findings as to the appropriate risk adjustment to the interest rate and term of the loan. On the contrary, the court found the 1% risk adjustment to be reasonable and made numerous findings as to the risk the plan posed to SummitBridge, including: Perkins' long history of successful farming; the richness of the land itself; and the fact that SummitBridge is over-secured on an appreciating asset and Perkins' payments are reducing the principal over the life of the plan. Perkins asked the bankruptcy court to take judicial notice that a 20-year loan at 4.5% was a typical market rate. SummitBridge did not submit any documentary or testimonial evidence.

SummitBridge suggests that the bankruptcy court erred by failing to take into account the contract rate on its notes to determine an appropriate interest rate. According to SummitBridge's motion for post-petition interest and fees, the note with the highest balance had an interest rate of 4.25%, and the interest rate on the other two notes with unpaid principal were 5.69% and 4.75%. Based on these rates and because the contract rate is only one piece of evidence regarding the market rate for such a loan, the bankruptcy court's finding 4.5% to be the appropriate interest rate was not in clear error.

In addition to the interest rate objection, SummitBridge further contends that it was prejudiced by the cramdown because it would not receive its first payment until a year after the plan was confirmed. However, the original loan called for yearly payments after the harvest, so the bankruptcy court found this treatment was no worse than the terms of the original loan. Based on this, we find no clear error.

**C.　　The Bankruptcy Court Did Not Err in Finding the Plan Met the "Best Interests of the Creditors' Test"**

Section 1225(a)(4), otherwise known as the best interest of creditors test, requires that for a plan to be confirmed, "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under Chapter 7 of this title on such date." Simply put, a Chapter 12 plan can only be confirmed if it provides more money to the unsecured creditors than a liquidation under Chapter 7.

To meet her evidentiary burden, Perkins provided a liquidation analysis which projected the proceeds which would be received from liquidating all the bankruptcy estate's assets. The analysis determined that after all secured, priority, and administrative claims and sales costs were paid, there would be no funds left to pay non-priority unsecured creditors. The bankruptcy court considered this liquidation analysis and the testimony from the confirmation hearing and found that the plan met the best interests of creditors test. SummitBridge argues that this determination was in error because the liquidation analysis failed to take into account the value of the crops currently on the land. We disagree.

As a preliminary matter, there is disagreement among the courts as to whether the Chapter 12 liquidation analysis is based on the value of a hypothetical Chapter 7 for the debtor—which under § 541 consists of the debtor's property on the petition date—or the value of the Chapter 12 estate—which under § 1207 also includes the property acquired by the debtor post-petition. This distinction is important since crops planted post-petition would be part of the Chapter 12 estate, but would not be part of the Chapter 7 estate. *See In re Foos*, 121 B.R. 778, 782 (Bankr. S.D. Ohio 1990) (liquidation analysis is based on § 541 estate). *But see In re Bremer,* 104 B.R. 999, 1008 (Bankr. W.D. Mo. 1989); *In re Perdue,* 95 B.R. 475, 477 (Bankr. W.D. Ky. 1988); *In re Bluridg Farms, Inc.,* 93 B.R. 648 (Bankr. S.D. Iowa 1988). However, we need not determine this since Perkins included the property value of the crops in her liquidation analysis.

The liquidation summary of Perkins' amended plan included a total property value of $2,728,570: $2,273,000 in real property and $455,570 in personal property. Perkins' Amended

Schedule A/B reflected $2,137,200 in real property and $348,820 of personal property, including $100,000 for the 2016 crops, for a total of $2,486,020. Perkins' son testified at the hearing that the total value of the crops in the ground was $726,000. On cross examination, he estimated that the cost of the remaining inputs, harvest costs, transport costs, taxes, and the pay-offs of liens secured by the crops would be between $418,000 and $600,000, meaning the net value of the crops was between $308,000 and $126,000—less than the estimate in the liquidation analysis. Thus, the liquidation analysis not only included $100,000 for the value of the 2016 crops, but based on the son's testimony, overstated the amount of assets to be liquidated. Accordingly, there is ample evidence in the record to support the bankruptcy court's finding that the plan met the best interests of creditors test, and we find no clear error.

**CONCLUSION**

For the foregoing reasons, the Panel AFFIRMS the bankruptcy court's order confirming Perkins' amended Chapter 12 plan.